IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | 4:18CR3070 |
|---|---|
| Plaintiff, | |
| vs. | GOVERNMENT'S BRIEF IN RESPONSE TO MELTON'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS, AND REQUEST FOR EVIDENTIARY HEARING |
| JOSEPH L. MELTON, | |
| Defendant. | |

## Introduction

COMES NOW the United States of America, Plaintiff, and provides the following response to Defendant Joseph L. Melton's (hereafter "Melton") motion to suppress (Filing No. 34), and supporting brief (Filing No. 35).

## Background

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) conducted a qualification inspection on Leadfoot, LLC (Leadfoot) located in Holdrege, Nebraska, and the company was subsequently approved as a licensed manufacturer of firearms on December 11, 2013. (Filing No. 35 at ECF pp. 9, 10, 34). Melton runs the day-to-day operation and maintains the required records of Leadfoot, which primarily manufacturers silencers. *Id.* at 10, 35. In early May 2017, ATF received information regarding Melton and his operation of Leadfoot. The concerns addressed issues regarding the National Firearms Act (NFA), straw purchases, and the general conduct of business. *Id.* at 31, 33.

On August 24, 2017, Industry Investigations Investigators (IOI) Kubert and Vickers, with the assistance of Special Agents Shelton and Sorenson, attempted an unannounced compliance inspection at Leadfoot. *Id.* at 8, 35. The agents initially went to the front door of the business, but it was locked, and knocking did not yield a response. *Id.* IOI Kubert attempted to contact

Melton at 8:37 a.m., but had to leave a voicemail. *Id.* Melton promptly returned the call at 8:45 a.m.. *Id.* IOI Kubert explained they were at Leadfoot to conduct a compliance inspection, but Melton claimed he was in Aurora, Colorado, and would not be back for another week. *Id.*

IOI suggested that Robert Dahlgren, Melton's business partner, could be present during the inspection, but Melton indicated Dahlgren had nothing to do with the business, and was a business partner. Melton wanted to reschedule, which the agents indicated they would do if they received verification from Melton that he was actually in Colorado. Melton was asked to text a picture of a mountain or unique landmark. *Id.* Melton did not immediately respond, so the officers made additional attempts to locate Melton around Holdrege. *Id.* at 8, 9, 35. The agents also left a message for Dahlgren. *Id.* at 8.

Dahlgren returned the agents' call at 12:51 p.m. He indicated he did not have a key to the premises, but told the officers he would instruct Melton to call them back. Dahlgren called the officers back at 1:37 p.m., and was surprised that Melton had not returned the agents' call. He reported that Melton told him he was on his way to Colorado, and that the inspection had been rescheduled. Upon being advised that this conflicted with what the agents knew, Dahlgren said he would get Melton to call them. *Id.* at 9.

Melton eventually called IOI Kubert at 2:03 p.m. He admitted he was not in Colorado, but that he panicked and went to his sister's house in Lexington when the officers called about the inspection. Melton claimed his "paperwork is all fucked up," and his "records were a mess," and he was concerned that ATF was going to throw him in jail. *Id.* at 9, 35. The inspection began at 3:15 p.m., and concluded the next day on August 25. *Id.* at 35.

IOI Kubert reviewed the preliminary findings of the inspection with Melton on September 1, 2017. *Id.* at 15, 35-36. A closing conference was held with Melton on November

2

7, when a Report of Violations was issued and corrective actions were discussed.  IOI Kubert further advised Melton that the inspection could result in a warning conference or revocation.

The inspection resulted in 18 violations of federal code and statutes:

1. Willfully obstructing ATF's right of entry to conduct a compliance inspection;
2. Falsification of required records;
3. Conduct of business away from the licensed premises;
4. False statements and representation made by the licensee with respect to any information or records required by the Gun Control Act;
5. Failure to document the transfer of a firearm to a nonlicensee on ATF F 4473;
6. Failure to conduct a NICS check prior to the transfer of a firearm;
7. Failure to maintain an accurate Record of Firearms Manufactured or Otherwise Acquired;
8. Failure to maintain an accurate Manufacturer's Firearms Disposition Record;
9. Failure to apply required markings on firearms manufactured;
10. Failure to register silencers manufactured;
11. Failure to retain NFA registration documents on file for NFA weapons in inventory;
12. Unlawful possession of an NFA Weapon that is not identified by a serial number;
13. Receipt of a weapon transferred in violation of the provisions of the NFA; Possession of an NFA weapon not registered to the possessor in the National Firearms Registration and Transfer Record (NFRTR);
14. Failure to submit the Annual Firearms Manufacturing and Exportation Report (AFMER), ATF F 5300.11;
15. Failure to post and have available the license at the business premises;
16. Failure to complete ATF F 4473 in accordance to the directions on the form;
17. Error on Section A of ATF F 4473; and
18. Failure to properly record the document used to verify the identity of transferee.

(Filing 35, pp. 17-28).  IOI Kubert encouraged Melton to address the corrective actions and recordkeeping deficiencies.  *Id.* at 16, 36.  The corrective actions were not completed.  *Id.* at 36.  Melton surrendered several silencers that formed the basis of some of the violations on November 8, 2017.  *Id.* at 35, 36.

A two-count indictment was filed on June 20, 2018, charging Melton with one count of receipt or possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871, and one count of receipt or possession of a firearm unidentified by serial number, in violation of 26 U.S.C. §§ 5861(i) and 5871.  (Filing No. 1).  Melton now seeks to suppress all

3

evidence obtained as a result of the August 24, 2017, inspection. He claims the agents were required to obtain a warrant pursuant to the Gun Control Act of 1968 (GCA) and the Fourth Amendment because they had reasonable cause to believe that Melton was in violation of the recordkeeping requirements of the GCA prior to the inspection. He further argues that ATF was required to obtain, at minimum, an inspection warrant. (Filing 35, pp. 1-6). As discussed below, Melton's constitutional rights were not violated in light of ATF's authority under 18 U.S.C. § 923(g)(1)(B).

## Argument

**I.  The warrantless compliance inspection complied with the GCA, and therefore, did not violate the Fourth Amendment.**

**A.  The Fourth Amendment**

The Supreme Court has long recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes. *See v. City of Seattle*, 387 U.S. 541, 543, 546 (1967). *See also United States v. Long*, 797 F.3d 558, 565 (8th Cir. 2015). An owner or operator of a business thus has an expectation of privacy in commercial property, which society considers to be reasonable. *See Katz v. United States*, 389 U.S. 347, 361 (1967). *See also United States v. Lewis*, 864 F.3d 937, 941-42 (8th Cir. 2017). "This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect administrative inspections designed to enforce regulatory statutes." *New York v. Burger*, 482 U.S. 691, 699-700 (1987) (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312-13 (1978)).

An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home. *See United States v. Perry*, 548 F.3d 688, 691 (8th Cir. 2008) (quoting *Burger*, 482 U.S. at 700). This expectation of privacy is

4

particularly attenuated in commercial property employed in "closely regulated" industries. *See Burger*, 482 U.S. at 699 (citing *Marshall, supra*) ("[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." (citation omitted)).

### B. The inspection was lawful under the GCA.

Section 923(g) provides that ATF has the authority to conduct a warrantless inspection of a licensee's inventory and records, specifically:

> B) The Attorney General may inspect or examine the inventory and records of a licensed importer, licensed manufacturer, or licensed dealer **without such reasonable cause or warrant**--
>
> > (i) in the course of a reasonable inquiry during the course of a criminal investigation of a person or persons other than the licensee;
> >
> > **(ii) for ensuring compliance with the record keeping requirements of this chapter--**
> >
> > > **(I) not more than once during any 12-month period; or**
> > >
> > > (II) at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee; or
> >
> > (iii) when such inspection or examination may be required for determining the disposition of one or more particular firearms in the course of a bona fide criminal investigation.

18 U.S.C. § 923(g)(1)(B) (emphasis added). The section specifically at issue here is § 923(g)(1)(B)(ii)(I), which authorizes an annual compliance inspection without a warrant. *See United States v. Louis*, 559 F. 3d 1220, 1228 (11th Cir. 2009) (noting that firearm's dealers must submit to periodic, *indeed surprise*, *inspections* and investigations by the ATF and other law enforcement of their business practices under 18 U.S.C. § 923(g)(1)(B)(ii)).

A plain reading of the statute authorizes an inspection of licensed manufacturers and dealers once a year without requiring reasonable cause to believe the licensee is not complying

5

with the law, and without requiring a warrant. ATF conducted a qualification inspection when Melton first applied for his federal firearms license in December of 2013, and conducted no other inspections until the one at issue in this case on August 27, 2017. (Filing No. 35 at ECF p. 10) Since more than a year had elapsed since the previous inspection, ATF was authorized under the statute to conduct the inspection without needing reasonable cause to believe Melton was not complying with the law, and without a warrant. The silencers that Melton illegally possessed were discovered during the course of that inspection. "Nor do we think that this administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself." *Burger*, 482 U.S. at 716.

The statute which authorized the inspection has been upheld by the Supreme Court. In *Biswell*, the Supreme Court noted that when a federally licensed gun dealer chooses to engage in this pervasively regulated business, it does so knowing that his business records, firearms, and ammunition will be subject to warrantless compliance inspections under the GCA. *Biswell*, 406 U.S. at 316-17 (pursuant to the authorized procedures under 18 U.S.C. § 923 of the GCA, the warrantless search and seizure of weapons at a licensed dealer's gun shop did not violate the Fourth Amendment). *See also Burger*, 482 U.S. at 700-01 (1987) (acknowledging the vitality of *Biswell*'s exception to the warrant requirement for inspection of commercial premises in a pervasively regulated industry such as guns).

**C. Melton's argument that a warrant was required is misplaced.**

The crux of Melton's argument is his claim that when there may be reason to believe that a licensee is not complying with the law, authorities are forbidden from completing an annual compliance inspection under § 923(g)(1)(B)(ii)(I), and can only inspect after seeking a warrant

6

as authorized under § 923(g)(1)(A). Melton contends that for an inspection to take place under § 923(g)(1)(B)(ii)(I), "[t]here cannot be reasonable suspicion that the licensee has violated that GCA." (Filing No. 35 at ECF p. 4)  Melton's argument is based on a misinterpretation of the statute, and there are a few reasons to reject it.  First, Melton's argument is contrary to a plain reading of the statute.  In support of his argument, Melton cites the preceding subsection, § 923(g)(1)(A).  Section 923(g) provides for several alternative grants of authority to conduct an inspection.  One of the authorized methods to conduct an inspection, under § 923(g)(1)(A), is to seek a warrant when there is reasonable cause to believe a violation has occurred.  The statute, however, provides for additional legal means of conducting an inspection "without such reasonable cause or warrant" under § 923(g)(1)(B).  A plain reading of the statute shows that there are alternative legal justification for conducting the inspection, either with a warrant, or in some cases without requiring a warrant.  The inspection at issue in this case was conducted under § 923(g)(1)(B)(ii)(I), which may be done "without such reasonable cause or warrant … ."  There is simply nothing in the statute forbidding inspectors from completing the annual compliance inspection under § 923(g)(1)(B)(ii)(I) simply because they have reason to believe the licensee is not complying with the law.  Melton misreads a grant of authority under the statute as a limitation.

The second reason why Melton's argument should be rejected is because it leads to absurd results.  Melton's interpretation is such that when there may be reason to believe that a licensee is not complying with the law, authorities are forbidden from completing an annual compliance inspection under § 923(g)(1)(B)(ii)(I), and must only seek a warrant as authorized under § 923(g)(1)(A).  Melton's interpretation would mean that law-abiding licensees have a lesser expectation of privacy than those who are known to be violating the law.  According to

Melton, one would gain greater legal protection because they are violating the law. This absurd implication shows that Melton's interpretation frustrates the plain meaning of the statute. The Supreme Court rejected an argument in *Burger*, albeit while considering a different statute, in part because it too would yield a similar absurd result.

> The purposes of maintaining junkyards in the hands of legitimate businesspersons and of tracing vehicles that pass through these businesses, however, also are served by having the officers examine the operator's inventory even when the operator, for whatever reason, fails to produce the police book. Forbidding inspecting officers to examine the inventory in this situation would permit an illegitimate vehicle dismantler to thwart the purposes of the administrative scheme and would have the absurd result of subjecting his counterpart who maintained records to a more extensive search.

*Burger*, 482 U.S. at 716.

The third reason why Melton's interpretation should be rejected is because it lacks support in the case law. The ATF routinely conducts inspections of licensees nationwide, and has done so for many years. Even though such inspections have happened often, Melton cites no cases that support his interpretation of the statute. On the contrary, in *United States v. Aiudi*, 835 F.2d 943 (1st Cir. 1987), both ATF and local law enforcement had received information that Aiudi was violating the law. ATF received information "that Aiudi was dealing in stolen firearms, knowingly dealing with convicted felons and failing to properly record his transactions. The ATF also had reason to believe that Aiudi illegally possessed and intended to sell several machine guns and stolen handguns." *Aiudi*, 835 F.2d at 944. The inspection of Aiudi's records, and the seizure of his firearms, was upheld under the annual, warrantless, compliance inspection under § 923(g). *See also Giragosian v. Bettencourt*, 614 F.3d 25 (1st Cir. 2010) (annual compliance inspection completed at the request of local law enforcement).

> Giragosian asserts that Bettencourt's search did not qualify as a lawful compliance inspection because he acted on a local police department's request. The argument fails. Section 923 does not prohibit an ATF officer from

8

> conducting an inspection at the request of local law enforcement, **nor is there any reason to think that Congress intended to prevent ATF officers from carrying out compliance inspections when they have a particular reason to be concerned that violations might exist.**

*Id*. at 30 (emphasis added). "Nor do we think that this administrative scheme is unconstitutional simply because, in the course of enforcing it, an inspecting officer may discover evidence of crimes, besides violations of the scheme itself." *Burger*, 482 U.S. at 716.

## II. Melton's statements to law enforcement should not be suppressed.

While he does not argue for suppression of statements in his brief, Melton's motion to suppress alleges that his statements should be suppressed. (Filing No. 34) In his motion, Melton asserts two grounds for the suppression of his statements. First, Melton states that the inspection was unlawful, and so his statements during the course of the inspection were "fruits of the poisonous tree." (Filing No. 34 at ECF p. 1) For the reasons stated above, the inspection was lawful. Consequently, Melton's statements are admissible.

Second, Melton states that his statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). (Filing No. 34 at ECF p. 2) *Miranda* does not apply unless Melton was in custody. While inspections of a variety of highly regulated businesses are common, Melton provides no argument or authority to show that an inspection constitutes a custodial interrogation and that the *Miranda* warnings were required. A court looks at the totality of the circumstances at the time of questioning to determine whether a defendant was in custody. *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (citing *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002)).

> Factors useful in considering whether custody is involved are whether the suspect was advised that he was free to go, whether he was restrained, whether he initiated contact with authorities, whether strong arm tactics or deceptive stratagems were used, whether the atmosphere was police dominated, and whether the suspect was placed under arrest at the termination of questioning.

*United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir. 1995) (citing *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990)). This was a mere routine inspection that occurred at Melton's business. Melton was advised that inspections of his business would occur when he chose to engage in the business of manufacturing silencers. Melton's movements were not restricted during the inspection. At the conclusion of the inspection, the inspectors left and Melton was not arrested. No strong arm tactics were used, nor any deceptive stratagems. The inspection was completed primarily by unarmed inspectors. Two agents were also present, but their firearms remained holstered and concealed from sight. This is not a situation similar to a formal arrest.

In *United States v. Jamieson-McKames Pharm., Inc.*, 651 F.2d 532 (8th Cir. 1981) an inspection of a highly regulated business occurred. The Court cited *Biswell* in support of the finding that the inspection was lawful. The Court ruled that *Miranda* warnings were not required. *Id.* at 543. *See also United States v. Acri Wholesale Grocery Co.*, 409 F. Supp. 529, 533 (S.D. Iowa 1976) (During an FDA inspection, the defendants "were neither in 'custody' nor deprived of their freedom at any time in question.")

## Conclusion

For the reasons stated above, the United States respectfully requests that Melton's motion to suppress be denied.

        UNITED STATES OF AMERICA, Plaintiff

        Respectfully submitted,

        JOSEPH P. KELLY
        United States Attorney
        District of Nebraska

By:   *s/ Matthew R. Molsen*
        MATTHEW R. MOLSEN, #22693
        Assistant U.S. Attorney
        487 Federal Building
        100 Centennial Mall North
        Lincoln, NE  68508
        Tel:  (402) 437-5241
        Fax:  (402) 437-5390
        E-mail:  matthew.molsen@usdoj.gov

## Certificate of Service

I hereby certify that on October 5, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all registered participants.  I also hereby certify that a copy of the same was served by regular mail, postage prepaid, to the following non-CM/ECF participants: N/A

        *s/ Matthew R. Molsen*
        Assistant U.S. Attorney