<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEBRASKA
 2

 3   UNITED STATES OF AMERICA,      )    Case No. 4:18CR3070
                                    )
 4             Plaintiff,           )
                                    )
 5   vs.                            )
                                    )
 6   JOSEPH L. MELTON,              )
                                    )    Lincoln, Nebraska
 7             Defendant.           )    November 8, 2018

 8

 9
                        TRANSCRIPT OF PROCEEDINGS
10             BEFORE THE HONORABLE CHERYL R. ZWART
                    UNITED STATES MAGISTRATE JUDGE
11

12                   A-P-P-E-A-R-A-N-C-E-S

13   FOR THE PLAINTIFF:          Mr. Matthew R. Molsen
                                 Assistant United States Attorney
14                               100 Centennial Mall North
                                 487 Federal Building
15                               Lincoln, Nebraska 68508

16
     FOR THE DEFENDANT:          Mr. Christopher M. Ferdico
17                               Mr. Justin B. Kalemkiarian
                                 Berry Law Firm
18                               2650 North 48th Street
                                 Lincoln, Nebraska 68504
19

20   COURT REPORTER:            Ms. Lisa Grimminger, RDR, CRR, CRC
                                 111 South 18th Plaza
21                               Suite 3131
                                 Omaha, NE 68102
22                               (402) 661-7379

23

24
     Proceedings recorded by electronic sound recording, transcript
25   produced with computer.
</pre>

1        (At 1:35 p.m. on November 8, 2018, with counsel for the

2    parties and the defendant present:)

3        THE COURT:  We are on the record in Case Number

4    4:18CR3070, United States of America versus Joseph L. Melton.

5        Counsel, please enter your appearance.

6        MR. MOLSEN:  Your Honor, please show the appearance

7    of Matt Molsen for the government.  And then seated with me at

8    counsel table is Cory Shelton, the case agent.

9        THE COURT:  All right.

10        MR. FERDICO:  Chris Ferdico on behalf of the

11    defendant with the Berry Law Firm.

12        THE COURT:  Okay.

13        MR. KALEMKIARIAN:  Also, please enter the appearance

14    of Justin Kalemkiarian on behalf of Mr. Melton.

15        THE COURT:  All right.  Mr. Melton, you are here

16    today for your hearing on the motion to suppress that was filed

17    by your attorneys on your behalf.

18        Are the parties ready to proceed?

19        MR. MOLSEN:  Yes, Your Honor.

20        MR. FERDICO:  Yes, Your Honor.

21        THE COURT:  And do you want opening statements at all

22    at this time?

23        MR. MOLSEN:  No, Your Honor.

24        MR. FERDICO:  No, Your Honor.

25        THE COURT:  All right.  Let me ask a quick question.

1    As I read the briefs from the defendants, we're talking about

2    the alleged Fourth Amendment violation for the search, and on

3    the statements is the -- is there an argument about the

4    statements, any statements?

5         MR. MOLSEN:  It was mentioned in the motion briefly

6    but not --

7         THE COURT:  It was mentioned, and then you briefed it

8    on the behalf of the government as saying essentially it was

9    mentioned only briefly and it -- the statements weren't a

10   violation of the Fifth Amendment, and since there was no Fourth

11   Amendment violation, they are not fruit of the Fourth Amendment

12   violation either.

13        But I wanted to ask the defendants:  Are we going down a

14   Fifth Amendment, Fourth Amendment, or no -- nothing on the

15   statements?

16        MR. FERDICO:  It's a Fourth Amendment argument for

17   all.

18        THE COURT:  Okay.  For -- so we're only dealing with

19   the Fourth today.

20        MR. FERDICO:  Yes.  Yes, ma'am.

21        THE COURT:  Got it.  Thank you.  All right.  And

22   sequestering witnesses?  Does the government have more than one

23   witness?

24        MR. MOLSEN:  Just -- I'll have Cory testify.  His

25   will be pretty brief.  The main testimony is going to come from

1    Greg, the inspector, and I'll have him up first.

2              THE COURT:  Okay.

3              MR. KALEMKIARIAN:  Go ahead, Chris.

4        Judge, the defendant would ask for sequestration of

5    witnesses.

6              THE COURT:  If there's anything more than the -- than

7    Mr. Shelton, who is the representative for the government, and

8    who -- what was your inspector?

9              MR. MOLSEN:  Greg Kubert.

10              THE COURT:  Okay.  Is there any other witnesses?

11              MR. MOLSEN:  No, Your Honor.

12              THE COURT:  Okay.  Then I don't think there's anybody

13    to sequester.  All right.  Assuming that we only have those two

14    witnesses, we can proceed.

15              MR. MOLSEN:  Okay.

16              THE COURT:  Go ahead.

17              MR. MOLSEN:  Your Honor, the government would call

18    Inspector Greg Kubert.

19              THE COURT:  All right.  Mr. Kubert.

20              COURTROOM DEPUTY:  Go around that way, and go ahead

21    and have a seat.

22              MR. KALEMKIARIAN:  Judge, before we get to the

23    questioning, I'd like permission for Mr. Melton to have

24    handcuffs removed so that he can take notes.

25              THE COURT:  Any reason the marshals know as to that

1    he's a specific danger I need to be worrying about?

2                DEPUTY MARSHAL:  No.  We can undo one.

3                THE COURT:  All right.  Thank you.

4                MR. KALEMKIARIAN:  That's fine.

5                THE COURT:  Are you right-handed, sir, or

6    left-handed?

7                THE DEFENDANT:  I'm right-handed.

8                THE COURT:  All right.  Thank you.

9                COURTROOM DEPUTY:  Please state your full name for

10   the record and spell your last name for me.

11               THE WITNESS:  Greg Kubert, K-U-B-E-R-T.

12               COURTROOM DEPUTY:  Raise your right hand.

13               UNIDENTIFIED MALE SPEAKER:  Thank you.

14                GREG KUBERT, PLAINTIFF'S WITNESS, SWORN

15               THE COURT:  You may proceed.

16               MR. MOLSEN:  All right.  Thank you.

17                          DIRECT EXAMINATION

18   BY MR. MOLSEN:

19   Q.   Sir, how are you currently employed?  How are you

20   currently employed?

21   A.   I'm employed as an industry operations investigator with

22   ATF.

23   Q.   Okay.  And how long have you worked in that capacity?

24   A.   Fourteen years.

25   Q.   And what are your duties as an industry operations

1    inspector for ATF?

2    A.    We carry out ATF's regulatory mission, primarily with the

3    firearms and explosives industries.

4    Q.    Okay.  Do you oversee regulation of people who hold

5    federal firearms licenses?

6    A.    I do.

7    Q.    Okay.  And is that part of the Department of Justice

8    regulation of the firearms industry?

9    A.    It is.

10   Q.    Okay.  And when you're overseeing the -- the federal

11   firearms licenses, who is it who holds those federal firearms

12   licenses?

13   A.    People that apply to either deal, manufacture or import

14   firearms.

15   Q.    Okay.  And so sellers and manufacturers primarily?

16   A.    Correct.

17   Q.    Okay.  Have you heard of the -- the term Class III items?

18   A.    Yes.

19   Q.    And what are Class III items?

20   A.    Class III items are what folks in the industry commonly

21   refer to as NFA weapons.  National Firearms Act weapons are

22   things like silencers, machine guns, short barreled rifles,

23   that have a higher level of regulation as compared to regular

24   rifles, shotguns and handguns.

25   Q.    And are -- is there additional regulation that encompasses

1    those types of weapons?

2    A.    There is.

3    Q.    For -- let's say an average person wants to own a silencer

4    or a short barreled rifle.  What must they do in order to do

5    that?

6    A.    Okay.  They -- they have two options.  An individual would

7    be able to make one themselves.  The other option would be to

8    purchase one from a Class III or NFA dealer.

9    Q.    Okay.  And those NFA dealers, are they -- are they among

10   the people who receive federal firearms licenses?

11   A.    Yes.  In order to be an NFA dealer, you must first have an

12   FFL.

13   Q.    Okay.  And those -- so when the -- let's say the person

14   wants to buy it from someone with a federal firearms license or

15   an FFL.  How does that process work?  What do they do?

16   A.    Okay.  The process would start with, you know, them

17   finding something that they either wanted to purchase or that

18   they wanted to have made for them, and then when -- if the

19   dealer needs to get it ordered in, they've actually have --

20   need to fill out a Form 3 to get it in from the supplier,

21   because the movement of all these items are tracked

22   individually.  And then once it's at the store, the customer

23   and the dealer would complete an ATF Form 4, which is the

24   transfer from the dealer to the individual.  That Form 4 is

25   sent in with a $200 tax payment.

1       The NFA branch takes -- it reviews the documentation,

2   makes sure it's complete.  And then once it's approved, they

3   actually put a physical stamp on it, return it to the dealer.

4   And then the dealer would be able to complete the transfer to

5   the customer by having the customer come in, fill out ATF Form

6   4473, which is the standard form for any firearm transaction.

7   And then after -- after that's completed, the -- the NFA item

8   and the stamped Form 4 would be handed over to the customer.

9   Q.   Okay.  And so we're talking about a couple different forms

10  here.  So if -- if average Joe citizen wants to purchase a

11  silencer, they have to complete the Form 4; is that correct?

12  A.   Correct.

13  Q.   And does that track -- the individual item, the silencer

14  or the short barreled rifle or whatever it may be, is that

15  going to be identified by serial number on that Form 4?

16  A.   Yes.

17  Q.   And is that specific item then registered to the

18  purchaser?  I mean, can you go back and track, like, who's the

19  owner of this item?

20  A.   Yes, yes.

21  Q.   And then -- so the purchaser has to pay the $200 tax; is

22  that correct?

23  A.   Correct.

24  Q.   And then once that process is approved, then they have to

25  complete the usual paperwork that a person would do when

1   purchasing any firearm?

2   A.   Correct.

3   Q.   Okay.  And you mentioned the Form 4473.  Is that that --

4   that process when a person is purchasing any firearm at all?

5   A.   Correct.

6   Q.   Okay.  The Form 4473, what does that entail?  Like, what's

7   the purpose of that form?

8   A.   It's the over-the-counter firearms transaction record that

9   all FFLs are required to have completed anytime a firearm is

10  sold.  The -- the front of the form is filled out by the

11  customer with their identifying information and their

12  declaration that they're not prohibited from possessing

13  firearms, and then the remainder of the form is completed by

14  the dealer where they document that the background check was

15  conducted, what gun by make, model, serial number, caliber was

16  sold, and then the date that the transaction was completed.

17  Q.   Would the -- you mentioned it's to -- that it asks the

18  person questions to see if they're not prohibited; is that

19  right?

20  A.   Correct.

21  Q.   Is that generally the main purpose of that form, to make

22  sure the purchaser is not a prohibited person?

23  A.   It's one of the main purposes, yes.

24  Q.   Okay.  And then a background check is done?

25  A.   Correct.

1    Q.    Okay.  How is that -- how is that accomplished?

2    A.    In the State of Nebraska, there's a variety of ways that

3    it's handled.  The first way is if the customer has a Nebraska

4    firearms purchase certificate or a Nebraska concealed handgun

5    permit, the licensee doesn't need to do a -- an additional

6    background check.  They can accept that permit as proof that

7    the person would be legally able to possess firearms.  They

8    document that information on the 4473, you know, the permit

9    number.

10        The other option would be on the sale of a rifle or

11   shotgun, the dealer would be able to call into NICS, the

12   National Instant Background Check System administered by the

13   FBI, to have them run a background check, you know, to figure

14   out if they could transfer the gun.  And then in the case of

15   NFA firearms, during the Form 4 process if the transfer -- if

16   the transfer is to an individual person --

17   Q.    Uh-huh.

18   A.    -- the background check is conducted during that time.

19   Q.    Okay.

20   A.    If the transfer is to -- well, prior -- prior to July of

21   2016, if the transfer is to a different entity, like a trust or

22   a company, the background check is not conducted until the 4473

23   is completed by the trust representative there to pick it up.

24   Q.    Okay.  So if you're doing an inspection on a company who

25   manufactures and sells silencers, are those going to be the

1    primary forms that we're -- that you'd be looking at, the Form

2    4s and then the 4473s?

3    A.   I'm definitely looking at those.  I'd also be looking at

4    Form 2s, which is the manufacturer's declaration of here's what

5    I've manufactured, here's what I've made.  And then Form 3

6    would be if they had ordered in any NFA weapons --

7    Q.   Okay.

8    A.   -- from other suppliers.  So those would be the main ones,

9    yes.

10   Q.   Okay.  So just making sure I have it right, if someone is

11   manufacturing what we've called NFA items, items like

12   silencers, for example, they complete a Form 2 every time a

13   silencer is produced, then?

14   A.   Yeah.  By the end of the day that the -- or that the

15   manufacture is complete, a Form 2 is submitted, and that's the

16   manufacturer's notification that, hey, I made this, and that's

17   submitted to the NFA branch.  And usually they review,

18   document, put it into the system, and return it back as

19   received to the licensee within a couple weeks.  Also at that

20   time the manufacturer needs to, in their manufacturer's record,

21   record that on this date I made the silencer, the serial

22   number, this caliber.

23   Q.   Okay.  And on the Form 2 is the serial number of the --

24   each individual item documented?

25   A.   Yes, it is.

1    Q.   Okay.  So that's the Form 2.  And you said a Form 3.  So

2    if -- if a person holds a federal firearms license, are they

3    able to purchase some of those more regulated items such as

4    silencers from other federal firearms licensed dealers?

5    A.   Yes, they are.  And the purpose of the Form 3 is so that

6    when it goes from a distributor to a dealer that they don't

7    have to pay the $200 tax each time it moves.

8    Q.   Okay.  And then the Form 4 would be when the individual

9    customer purchases it from someone who's a federal firearms

10   licensed dealer?

11   A.   Correct.

12   Q.   Okay.  And then we have the 4473s.  That's the background

13   check, essentially?

14   A.   Correct.

15   Q.   Okay.

16           THE COURT:  I have to ask:  What is Form 1?  We have

17   2, 3 and 4.

18           MR. FERDICO:  Judge --

19           THE WITNESS:  Form 1?

20           MR. FERDICO:  -- you don't want to know.

21           THE WITNESS:  Form 1 is when an individual decides to

22   make their own.  So you would be able to make your own

23   silencer --

24           THE COURT:  Oh, okay.

25           THE WITNESS:  -- if you wanted to, but you would have

1   to --

2          THE COURT:  So there really is a Form 1.

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  I just thought --

5          THE WITNESS:  Yeah.

6          THE COURT:  -- maybe in the government's infinite

7   wisdom, it skipped one so -- okay.  Got it.

8   BY MR. MOLSEN:

9   Q.   Okay.  When you conduct an inspection of a place that

10  manufactures silencers, what -- I think we talked a little bit

11  before.  Was there anything else you look for other than the

12  Form 2s, 3s, 4s, and the 4473s?

13  A.   Well, I mean, we're looking at the manufacturing process

14  to make sure that the records that are required to be

15  maintained are being maintained.  A manufacturer is also

16  required to submit a annual manufacturing and exportation

17  report -- I don't remember the acronym, but Annual Firearms

18  Manufacturing and Exportation Report which is -- they're

19  quantifying for statistical purposes just how many firearms

20  they manufactured and put into commerce during a calendar year

21  and the ATF just uses that for statistical purposes.  There's

22  no -- things are not identified by serial number.

23  Q.   Okay.  And then when you're choosing a location for an

24  inspection, how are locations chosen?

25  A.   I mean, there's a variety of methods.  For a compliance

1    inspection usually at the headquarters level there's some type

2    of program for the year or whatever where, you know, there's a

3    particular program where, okay, we're going to try to hit all

4    the pawn shops in your state in a four-year period or try to do

5    all the manufacturers or all the high volume dealers, and so

6    that's the majority of the compliance work, is to satisfy some

7    of those programs.

8    Q.   Is your -- your office is in Omaha; is that correct?

9    A.   Yes, sir.

10   Q.   And how big of an area do you cover?

11   A.   We cover all of Nebraska and most -- or all of Iowa as

12   well.

13   Q.   Okay.  And in that area do you have an idea of how many

14   people or how many federal firearms licenses there are out

15   there?

16   A.   In Nebraska there's over 800.

17   Q.   Okay.

18            THE COURT:  Eight hundred?

19            THE WITNESS:  Yes, ma'am.

20            THE COURT:  All right.

21   BY MR. MOLSEN:

22   Q.   So then when there's 800 federal firearms licenses, are

23   there people who are not inspected on a regular basis?

24   A.   Yes.

25   Q.   Okay.  Are -- is that influenced -- like, how frequently

1   someone has been inspected, is that a factor to consider as

2   well?

3   A.   Yes.  You know, the -- there's, you know, five to six of

4   us in the Omaha office that cover these 800, and so there's a

5   resource issue with that.

6   Q.   Do you -- does ATF occasionally receive tips from the

7   public as to certain people who have federal firearms licenses

8   who may not be complying?

9   A.   Yes, we do.

10  Q.   Is that a factor that may motivate you to conduct a

11  compliance inspection?

12  A.   It is a -- yeah.  It's a factor that would lead to the

13  area supervisor deciding whether or not to issue an inspection.

14  Q.   Okay.  On August 24th of 2017, did you have the occasion

15  to conduct an inspection of a person -- or a business that held

16  a federal firearms license?

17  A.   Yes, I did.

18  Q.   And which business were you looking at that day?

19  A.   It was Leadfoot, LLC.

20  Q.   And what type of inspection was this?

21  A.   It was a compliance inspection.

22  Q.   And was this an unannounced inspection?

23  A.   It was unannounced.

24  Q.   Okay.  On this occasion had you received a warrant in

25  order to conduct that inspection?

1    A.    No.

2    Q.    And you said it was Leadfoot, LLC; is that correct?

3    A.    Correct.

4    Q.    When a person -- when you have a business like that who

5    obtains federal firearms licenses, are there owners who are

6    associated with the federal firearms license?

7    A.    Yes.

8    Q.    Okay.  And who were the listed owners for this license?

9    A.    The responsible persons on the license were Joseph Melton

10   and Robert Dahlgren.

11   Q.    Okay.  How do you spell Robert --

12            THE COURT:  What was Robert's last name again?

13            THE WITNESS:  Dahlgren.

14            THE COURT:  Okay.  Thank you.

15   BY MR. MOLSEN:

16   Q.    How do you spell that, if you know?

17            THE COURT:  Is it D-a-h-l-g-r-e-n?

18            THE WITNESS:  Yes, ma'am.

19            THE COURT:  All right.

20   BY MR. MOLSEN:

21   Q.    And in this case had you received indications or any tips

22   that Leadfoot, LLC, had not been in compliance?

23   A.    We had.

24   Q.    Okay.  And without mentioning names, what type of

25   information had you received?

1   A.   An anonymous call -- or a caller called in to report

2   concerns about Leadfoot, and those calls were taken by special

3   agents in our office, and then that information was -- was

4   brought over to me.

5   Q.   And what was your understanding of the -- of the nature of

6   the complaints?

7   A.   That -- that straw purchases were being conducted, that

8   fire -- or that manufacturing was being conducted off site,

9   that there were fully automatic guns on site.  That was the

10  gist of it.

11  Q.   And when you say fully automatic weapons, those are what

12  would be called Class III items; is that correct?

13  A.   Yeah.  It would be defined as a machine gun.

14  Q.   With the type of federal firearms license that Leadfoot

15  had, would they be allowed to possess fully auto -- or full

16  auto rifles?

17  A.   They would be allowed to.  When I checked, though, they

18  didn't have any registered to them.

19  Q.   Okay.  And then after receiving that information did you

20  check to see when -- when the inspection had last been done?

21  A.   Yes, I did.

22  Q.   Okay.  Was -- when was F- -- when was the FFL or the

23  federal firearms license issued for Leadfoot, LLC?

24  A.   2013.

25  Q.   And when a person applies for a federal firearms license

1    to manufacture firearms, is there an inspection that's done as

2    part of that process?

3    A.    There is.  A qualification inspection is conducted.

4    Q.    And what's involved in a qualification inspection?

5    A.    In a qualification inspection we verify that the

6    information put on the application is correct, we verify that

7    they meet the statutory requirements to obtain an FFL, and then

8    we do a site visit, see where business is going to be

9    conducted, talk to the licensee -- or talk to the applicant

10   about what it is they're planning on doing, and then we will

11   provide, like, a review of the different forms and the records

12   that are required to be kept.

13   Q.    Okay.  And was that done in this case?

14   A.    It was.

15   Q.    Do you recall the date that that inspection was done?

16   A.    Not off the top of my head.  It was sometime in 2013.

17   Q.    In 2013?

18   A.    Yes, sir.

19   Q.    Okay.  Would it be in your report, by chance?

20   A.    It would be referenced in my report.

21   Q.    Okay.  Do you have your -- a copy of your report with you?

22   A.    I do.

23         MR. MOLSEN:  Okay.  Your Honor, may he be allowed to

24   examine his report?

25         THE COURT:  Any objection?

1      MR. FERDICO:  No objection.

2      THE COURT:  All right.  You may.

3   BY MR. MOLSEN:

4   Q.   Have you had a chance to review your report?

5   A.   Yes.

6   Q.   Okay.  And when was the -- that init- -- or that first

7   inspection done?

8   A.   December 11th, 2013.

9   Q.   Okay.  Does ATF maintain records of -- every time an

10  inspection is done of a person who holds a federal firearms

11  license?

12  A.   Yes.

13  Q.   And according to ATF records had any inspection been

14  completed on Leadfoot, LLC, since that -- that inspection in

15  December of 2013?

16  A.   No.

17  Q.   Okay.  So from December of 2013 to August of 2017, no

18  inspections?

19  A.   That's correct.

20  Q.   Okay.  And then on the August 2017 inspection, what type

21  of inspection was that?

22  A.   Compliance.

23  Q.   Okay.  When you conduct a compliance inspection, do you

24  arrive during normal business hours?

25  A.   Yes, we do.

1    Q.   And how do you know what the business hours are going to

2    be for a business like Leadfoot?

3    A.   So when they apply, they have to identify their business

4    hours, and on the original application I believe it was eight

5    to five Monday through Friday, and then on their renewal

6    application they're able to update their business hours.  And

7    then also, you know, we just look, and, you know, if we see

8    them at the store or if they're at the store working, that --

9    that would be their business hours.

10   Q.   Okay.  And did you arrive during the listed business hours

11   for the -- in this case?

12   A.   Yes.

13   Q.   Okay.  Do you recall what time it is you first arrived in

14   Holdrege, Nebraska, on August of 2017?

15   A.   To begin the inspection it was like 8:20-something in the

16   morning.

17   Q.   Okay.  And who -- who went with you for this inspection?

18   A.   Pardon?

19   Q.   Who went with you to complete the inspection?

20   A.   Okay.  IOI Brett Vickers was with me -- he was in on

21   training status -- and then Special Agent Cory Shelton and

22   Special Agent Tony Sorenson.

23   Q.   Okay.  And you said there was another industry operations

24   inspector or IOI with you?

25   A.   Correct.

1    Q.    And why was he there?

2    A.    He was there, number one, because he was my trainee at the

3    time.

4    Q.    Okay.

5    A.    And, number two, it was a great introduction for how NFA

6    inspections would look.

7    Q.    Okay.  Would you ordinarily do something like this by

8    yourself?

9    A.    Yes.

10   Q.    Okay.  And then on this occasion Special Agents Cory and

11   Tony were with you; is that correct?

12   A.    Correct.

13   Q.    Whose idea was it for them to come with?

14   A.    It was my idea.

15   Q.    And why did you ask them to accompany you?

16   A.    Primarily, when I had started my preinspection work and

17   had noted arrests in Mr. Melton's past, just for my own safety

18   I wanted to make sure that we had a special agent with us.

19   Q.    Okay.  And do people in your role, as the industry

20   operations inspectors or IOIs, as -- in your role as an

21   inspector, do you carry a firearm or weapons?

22   A.    No, we don't.

23   Q.    Okay.  Do IOIs have the authority to make arrests?

24   A.    No, we don't.

25   Q.    Do IOIs carry handcuffs?

1    A.    No.

2    Q.    Are IOIs permitted to seize firearms or any other evidence

3    that they come acrost?

4    A.    No, we are not.

5    Q.    Okay.  If you're -- let's say you're conducting an

6    inspection and you come acrost a weapon that's just on its face

7    illegal to possess.  What do you do in that situation?

8    A.    Document what we find and then make arrangements for a

9    special agent to pick it up.

10   Q.    Okay.  Would you -- and let's say if you were by yourself

11   in some town, would there be occasion where you might call the

12   police and ask them to seize it as well, or is that not very

13   common or --

14   A.    In 14 years I haven't --

15   Q.    Okay.

16   A.    -- run into that.

17   Q.    Okay.  So primarily document it and then notify the

18   agents, and they take care of it later?

19   A.    Correct.

20   Q.    Okay.  When you first arrived at the Leadfoot, LLC, on

21   August 24th, was the business open or closed at that point?

22   A.    The door was locked.

23   Q.    Okay.  Did you knock on the door or try to get anybody's

24   attention inside?

25   A.    Yeah.  We knocked on the door, and then we went to the

1    other entrance and knocked on that door as well, and there was

2    a sign indicating to UPS and FedEx deliveries to call a number

3    for Leadfoot.

4    Q.   Okay.  And what did you do at that point?

5    A.   I called that number.

6    Q.   Okay.  And what happened then?

7    A.   Initially it went to voice mail, and then Joe Melton had

8    called me back.

9    Q.   Okay.  Do you know about how much time elapsed between

10   leaving the voice mail and calling back?

11   A.   Five, ten minutes.

12   Q.   Okay.  Once Mr. Melton called you back, did you speak with

13   him at that time?

14   A.   Yes.

15   Q.   And what was discussed then?

16   A.   I let Mr. Melton know that I was at the licensed premises

17   or at his store to conduct a compliance inspection, and he

18   informed me that he was in Aurora, Colorado, visiting family.

19   Q.   Okay.  And what did you do when he said that he was in

20   Colorado?

21   A.   I -- well, I asked if the other responsible person -- if

22   Mr. Dahlgren would be available or, if that wasn't a

23   possibility, you know, if he could confirm that he was in

24   Colorado, I would just -- we'd reschedule it for the next week.

25   Q.   Okay.  And then Dahlgren, that was the other responsible

1   person listed on the federal firearms license?

2   A.   Correct.

3   Q.   And did Mr. Melton indicate whether or not Mr. Dahlgren

4   might be able to complete the inspection or let you in to

5   complete the inspection?

6   A.   I'm not sure if it was during this initial conversation,

7   but during conversations with Mr. Melton, he had shared that

8   Mr. Dahlgren wasn't involved in the day-to-day operation of the

9   business and wouldn't know where anything was.

10  Q.   Okay.  And then what was the response when you asked him

11  to send you some sort of verification that he was in Colorado?

12  A.   He said he would.

13  Q.   Okay.  And what type -- what were you looking for?

14  A.   I told him to, you know, go outside and take a picture of

15  a mountain or some other landmark just to confirm that he was

16  in Colorado and then we could reschedule.

17  Q.   Did you receive a response?

18  A.   I did not.

19  Q.   Okay.  What happened next?

20  A.   While I was waiting for a response, I did reach out to

21  Mr. Dahlgren and I -- I think initially I did leave a voice

22  mail, and I had sent a follow-up text to Mr. Melton asking --

23  you know, letting him know I hadn't received anything.  And

24  when I had called and actually got ahold of Mr. Dahlgren --

25  excuse me, he had let me know that he didn't have a key to the

1   building and he didn't -- wasn't involved in the day to day and

2   he didn't have any idea where the records would be.

3   Q.   Okay.  And then after speaking with Mr. Dahlgren, when was

4   the next time you had contact with Mr. Melton?

5   A.   I had another -- I had another discussion with

6   Mr. Dahlgren, who had called to confirm that Joe -- or that

7   Mr. Melton got ahold of me, and he had not, and then around

8   two o'clock Mr. Melton called my phone, and we talked.

9   Q.   Okay.  So that's 2 p.m.?

10  A.   Yes, sir.

11  Q.   So what was occurring from about 8:20 in the morning until

12  2 p.m. during that time?

13  A.   Okay.  During that time, you know, we were trying to

14  confirm if Mr. Melton was in Colorado.  While we were in

15  Holdrege, we went -- Special Agent Shelton and I, we walked

16  around and, you know, tried the doors again.

17       We visited buildings that we understood Mr. Melton was an

18  owner and talked with people there, if they had seen him, and

19  they had reported that they'd seen him that morning -- or that

20  they saw him last night.  Sorry.  And then, let's see, we went

21  to the gym that was open, unlocked, and music was playing, but

22  no one was there.  And then while we were looking, we also had

23  looked up to see what vehicles were registered to Mr. Melton

24  and were able to find those in the adjacent blocks.

25  Q.   Okay.  Did you travel to Holdrege that day for the purpose

1    of conducting that compliance inspection?

2    A.   We had actually traveled the day before and completed an

3    inspection further west --

4    Q.   Okay.

5    A.   -- and then the plan was to start Leadfoot the morning of

6    the 24th.

7    Q.   I see.  How far of a drive is it from your office in Omaha

8    out to Holdrege, Nebraska?

9    A.   About three hours.

10   Q.   Okay.  So not a small task to drive out there?

11   A.   Right.

12   Q.   Okay.  Three hours one way?

13   A.   Three hours one way, correct.

14   Q.   Okay.  Had Mr. Dahlgren arrived and if he had keys to open

15   it, would that -- would that have satisfied your interest as

16   far as being able to get into the business to complete the

17   inspection?

18   A.   Yes.  Yeah, we would have been able to get started.

19   Q.   Okay.  Would it have been necessary for Mr. Dahlgren to

20   stay there, or would you have been okay just conducting an

21   inspection on your own?

22   A.   It would not have been necessary.

23   Q.   Would it be his option, essentially?

24   A.   Correct.

25   Q.   Okay.  Same with Mr. Melton?

1    A.    Correct.

2    Q.    Okay.  When did the inspection eventually start?

3    A.    A little after three o'clock.

4    Q.    Okay.  That same day?

5    A.    Yes.

6    Q.    Okay.  When you spoke with Mr. Melton, did he ever

7    eventually tell you where he was?

8    A.    Yeah.  The two o'clock call Mr. Melton had advised that he

9    had been at his sister's in Lexington, Nebraska, about 45 miles

10   away -- or 45 minutes away.

11   Q.    Did he explain to you why it was that he told you he was

12   in Colorado?

13   A.    He didn't explain the Colorado.  He had explained that he

14   was at his sister's because after I'd called to let him know we

15   were going to conduct an inspection, he had panicked and went

16   with his sister to her house in Lexington.

17   Q.    Okay.  Did he explain why he was panicked?

18   A.    He was concerned that his records were not in good shape

19   and that -- you know, that we would find discrepancies at

20   the -- at the inspection.

21   Q.    Okay.  And is this conversation that you -- you mentioned

22   was over the phone?

23   A.    Yes, sir.

24   Q.    Okay.  Once the inspection starts, how was it you were

25   able to gain entry to the building?

1    A.    We met Mr. Melton.  He was walking his dog out in front of

2    the building.  And so we were on the other side of the street,

3    met him -- or across the street, introduced myself, met him,

4    and he let us into the building.

5    Q.    Okay.  And then once you were let into the building, what

6    happened then?

7    A.    I explained to Mr. Melton what the process was, you know,

8    that we'd be conducting an inventory, reviewing his records,

9    kind of giving him the outline of here's what an inspection is,

10   here's what we need to do.

11   Q.    And then did you begin the inspection at that time?

12   A.    Yes.

13   Q.    And how long -- how long did the inspection take?

14   A.    So from three -- I think we were there till about six or

15   seven, and during that time we'd attempted to initiate an

16   inventory, and then we had attempted to figure out where the

17   inventory was because we had found, you know, a lot of things

18   were in the midst of production.

19   Q.    Okay.  Did you complete the inspection that day?

20   A.    No.

21   Q.    Okay.  So you were there until maybe six, possibly seven

22   that night?

23   A.    Correct.

24   Q.    Okay.  Did Cory -- did Special Agent Cory Shelton and

25   Special Agent Tony -- was it Winkler, or was it the other --

1    A.    Sorenson.

2    Q.    Sorenson.  Okay.  Tony Sorenson.  Did they stay there the

3    entire time?

4    A.    They were there for the first couple hours.  Tony and

5    Brett were working on the gun to -- gun-to-book inventory while

6    Special Agent Shelton and I were speaking with Mr. Melton about

7    where things were, kind of getting the lay of the land, his

8    inspection -- or his manufacturing process, just so I could

9    wrap my head around what I was looking at.

10   Q.    Okay.

11   A.    But they -- after about a couple hours, Special Agents

12   Shelton and Sorenson left.

13   Q.    And why is it they left then?

14   A.    I didn't -- I did not have the concerns for my -- for our

15   safety that I had going into it because we were able to work

16   with Mr. Melton and at the point -- after a couple hours we

17   were kind of at the point of just that concern was abated, and

18   so it was more -- more of the bookwork stuff that IOI Vickers

19   and I do --

20   Q.    Okay.

21   A.    -- and so they didn't need to be there for that.

22   Q.    During the time that Special Agents Cory and -- or Shelton

23   and Sorenson were there, to your knowledge, did they ask any

24   questions of Mr. Melton?

25   A.    They did.

1  Q.   Okay.  Were you present for those?

2  A.   Yes.

3  Q.   Okay.  Were you able to complete the inspection on the

4  24th that day?

5  A.   No.

6  Q.   Okay.  What -- so you started at three.  You leave about

7  six.  Did you go home, or what happened then?

8  A.   We stayed at a nearby hotel.

9  Q.   Okay.  When did the inspection resume?

10  A.   That Friday morning, the 25th.

11  Q.   And before you left, did you explain to Mr. Melton that

12  you'd be back the next day?

13  A.   Yes.

14  Q.   Okay.  Did you ask him to meet you there to let you in

15  again?

16  A.   Yeah.  We had discussed and agreed upon a time where we'd

17  get going again in the morning.

18  Q.   Okay.  And when you're doing an inspection like this, are

19  you trying to match up the items that are -- the inventory with

20  the paperwork?

21  A.   Correct.

22  Q.   And what else are you doing?

23  A.   So trying to match up what's in inventory with the

24  paperwork, trying to match up what -- what the licensee says he

25  has manufactured or has in stock, what he's told our NFA branch

1    what he has versus what's actually there.  We'd also be

2    reviewing the transaction paperwork to make sure that every

3    time a silencer or gun was sold that a 4473 was completed.

4    We'd go through all the 4473s to make sure that they're

5    completed correctly, that the information is accurate,

6    complete, and that the background checks were conducted.

7    Q.   And in a business such as this of that size, if everything

8    was reasonably organized and generally in compliance, how long

9    would you anticipate an inspection like that might last?

10   A.   Yeah.  If things were good to go, I mean, based on the

11   volume and the special nature of the silencer manufacturing

12   business, I had budgeted a day, day and a half, to get

13   everything done.

14   Q.   Okay.  And how long did this one take?

15   A.   Well, we -- so we -- we got a late start on Thursday, and

16   then IOI Vickers and I worked Friday.  Started in the morning,

17   and we -- I think we went to mid afternoon.  And then that

18   following week in addition to, like, my other caseloads, work

19   on my other caseloads, you know, we were working on compiling

20   what do we know, what do we need to get confirmed?  And then so

21   we had to return a week later, on the 1st.

22   Q.   Okay.  So you were there the 24th and the 25th, and then

23   you come back on September 1st, the following week?

24   A.   Correct.

25   Q.   Okay.  On the conclusion of the 24th, had you completed

1    the inspection?

2    A.    No.

3    Q.    Okay.  By the end of the day on the -- when you left on

4    the 25th, had you completed the inspection then?

5    A.    No.

6    Q.    Okay.  And then why is it that -- that this one took

7    longer than you anticipated?

8    A.    The nature of the discrepancies that we found were so, I

9    guess, complete and so varied that rather than matching up what

10   we -- you know, what was there versus what the books said, we

11   had to first figure out what is here, because there would be

12   items -- his book would say, "I made the silencer, and the

13   silencer was sold to this person," and then we would look and

14   see that that silencer, number one, had never been made.

15         Just the order in which Mr. Melton was recording things in

16   his books hampered our ability to track things from cradle to

17   grave, you know, from when they were made to when they were

18   sold, and so there were -- as we had explained at the

19   beginning, a Form 2 is when the licensee says I have made

20   this -- these silencers, and so he would have these.  ATF says,

21   okay, we're looking for these.  And I had asked, "Where are

22   these?"

23         And Mr. Melton would point to, well, I think -- or he

24   would say, well, these -- these cores and that tube are

25   eventually going to be that silencer.  And so we had to match

1    up all the serial numbers he said he made versus what

2    actually -- could we actually see?  What does he actually have

3    the parts and pieces to make?  And some of those that hadn't

4    even been made had already been sold and removed from his

5    registry, and so there was that issue alone.

6         And then we had to confirm that all the manufacturing was

7    being conducted at the licensed premises, which we had

8    information that -- that the cores were being manufactured off

9    site, but Mr. Melton had insisted that he was making the

10   internal baffles on site by hand; so we had to look at that.

11        And then another factor we had to look at is Mr. Melton

12   was not having customers complete 4473s when they came to pick

13   up their silencer, and so there were, you know, this large

14   number of transactions where background checks should have been

15   done that weren't done or 4473s documenting the transfer should

16   have been done and weren't done.

17   Q.   How many instances of the failure to complete the 4473s do

18   you believe you uncovered?

19   A.   200.

20   Q.   Okay.  And those -- under federal law is a silencer --

21   does a silencer constitute a firearm?

22   A.   It does.

23   Q.   And so you'd have to complete the 4473 for each of those?

24   A.   Correct.

25   Q.   Okay.  Roughly how many violations did you uncover?

1   A.    Can I reference my report?

2   Q.    Sure.

3   A.    I mean -- 18.

4   Q.    Okay.  Eighteen total violations?

5   A.    Yes, sir.

6   Q.    And one of them might be, for example, a failure to do the

7   4473s?

8   A.    Correct.

9   Q.    So they were -- of those 18 there may be, like, for

10  example, you said 200 instances where that didn't happen?

11  A.    Correct.

12  Q.    Okay.  What was the general nature of the shop?  Was it

13  organized?

14  A.    Not -- not to the outside eye.

15  Q.    Okay.  And what was the -- did that hamper your ability to

16  complete an inspection in a timely fashion?

17  A.    Yes.

18  Q.    Okay.  And can you describe for us what the inside of the

19  shop was like?

20  A.    Sure.  So the -- the storefront area, there were items on

21  shelves and on the floor.  There were items around Mr. Melton's

22  desk, and then behind that wall there was a workshop area.

23  There was a lot of tools and silencer parts on a workbench and

24  on another counter.  Then in the middle section there was,

25  like, a kitchenette area, and in the oven -- he was using the

1   oven to bake the silencer parts before they were being

2   Cerakoted so that they would be dry as part of his

3   manufacturing process.  And then -- and there, you know,

4   were -- were outer tubes of silencers, inner cores of silencers

5   all in that area.

6       And then in the back area where the machinery was, the

7   lathe, drill press, stuff like that, you know, there were once

8   again silencer cores, odds and ends and -- yeah.  I mean, there

9   was -- and then, well, in the kitchenette assembly area, there

10  was a stack of Form -- approved Form 2s and Form 4s that

11  Mr. Melton had referred to as his to-do pile, which would be

12  actually assemble and make the silencers that he had already

13  reported as made and sold.

14  Q.   Okay.  So would the general nature of the -- I guess, for

15  lack of a better word, call it disorganized.  Did that hamper

16  your ability to complete the inspection in a timely fashion?

17  A.   Yes.

18  Q.   And then the condition of the paperwork and the number of

19  violations, did that also hamper your ability to complete it in

20  a timely fashion?

21  A.   Yes.

22  Q.   Okay.  When you conduct inspections, is it common or

23  uncommon for an inspection to span more than one day?

24  A.   It's -- it's common for more than one day.  Generally,

25  yeah, we would have that as generally a factor on the level of

1    activity, the size of the inventory, and the amount of

2    discrepancies we -- we uncover.

3    Q.   And you mentioned that you thought this might take a day

4    and a half?

5    A.   Yes, sir.

6    Q.   And that you had secured a hotel nearby?

7    A.   Correct.

8    Q.   Okay.  Did you have a hotel through the weekend until

9    Monday?

10   A.   No.

11   Q.   And do you have to -- when you get a hotel, do you have --

12   is there a process you have to go through to get approval and

13   book the hotel, essentially?

14   A.   Yeah, yeah.  The Department of Justice has us go through a

15   whole system where it's done their way, and so anytime that

16   there's overnight travel on the regulatory side, we need to get

17   that kind of lined up and hotels booked and everything at least

18   a few days in advance.

19   Q.   At the end of the day on the 25th, when you leave, how

20   close were you to completing the inspection at that point, do

21   you believe?

22   A.   Nowhere near half.  Maybe a third.

23   Q.   And then so did you have to schedule a time when you would

24   come back to complete that inspection?

25   A.   Yeah.  On the 25th, I had told Mr. Melton that, you know,

1   we were going to have to come back and kind of figure out where

2   things are, and I had given him some instructions as to

3   organizing.  Have an idea as to, okay, you know, these -- these

4   tubes and these cores, which serial -- or, you know, match them

5   up with your to-do list so that we know what's what.  And then

6   during that time I had prepared a spreadsheet letting him know,

7   okay, here's what ATF says you have.  Here's this.  Match it up

8   with what you've actually got, and let's figure out kind of

9   where we're at.

10  Q.    Okay.  And what's the mind-set here, like, when you're

11  doing this?  Like, what's the goal at that point when you're

12  giving him instructions like, hey, let's do this?

13  A.    Getting him towards compliance.

14  Q.    Okay.

15  A.    Yeah.  You know, we go out and find the problems and try

16  to get them fixed.

17  Q.    Okay.  So at the end of the day on the 25th, had you --

18  you -- had you had a chance to match up all the inventory to

19  the forms, for example?

20  A.    No.

21  Q.    Okay.  So I'm sure you had other tasks to do, but you're

22  still conducting the same inspection?

23  A.    Correct.

24  Q.    Okay.  Once -- see.  During -- let's go back and talk

25  about the first day, on August 24th.  Mr. Melton, where was --

1    was he there the entire time?

2    A.    Yes.

3    Q.    Okay.  Well, at least once you're inside the store?

4    A.    Yeah.  Once he arrived to the shop --

5    Q.    Yeah.

6    A.    -- he stayed the whole time.

7    Q.    Was he required to stay?

8    A.    No.

9    Q.    Okay.  On the 25th, was he there throughout the entire

10   time that you were there?

11   A.    Yes.

12   Q.    Was he required to stay there?

13   A.    No.

14   Q.    Okay.  Did you tell him or give him an idea of when you

15   may be back?  Was he finished on the 25th?

16   A.    Yeah.  I told him that, you know, we'd be back the

17   following week, and I don't recall if we had set a date before

18   I left on Friday or if I had touched base with him on, you

19   know, Monday the following week to let him know when we'd be

20   back out.

21   Q.    Okay.  Once -- once an inspection is complete, what --

22   what do you have to do at that point once you conclude an

23   inspection?

24   A.    Yeah.  When an inspection is complete, we hold a closing

25   conference with the licensee where we present them with the

1   Report of Violations, which is how on the regulatory side I

2   just document here's what the law -- or here's what the

3   regulations say you're supposed to do.  Here's what I found.

4   Here's what you need to do to get back into compliance.

5   Q.   Do you generate a report of your kind of findings and

6   recommendations?

7   A.   Yes.

8   Q.   Okay.  And then do you -- in that report do you document

9   violations?

10  A.   Yes.

11  Q.   Based on what you knew at the end of the 25th, were you in

12  a position where you could hold that closing conference, advise

13  Mr. Melton of what he was doing or what he could do to make the

14  situation better or complete your report?

15  A.   No.

16  Q.   Okay.  So when you returned back on the 1st, is that a

17  continuation of the same inspection that began on the 24th?

18  A.   Yes.

19  Q.   At any time was Mr. Melton threatened with arrest?

20  A.   No.

21  Q.   Okay.  When you were there conducting the inspection, were

22  there some silencers that caused you specific concern?

23  A.   Yes.

24  Q.   And what types of silencers were those?

25  A.   There were some complete silencers that were unmarked,

1    unregistered in his R & D area, and then there was another

2    silencer, a complete silencer, that was not registered to him

3    but registered to a different individual.

4    Q.    Okay.  You mentioned the ones without the serial numbers.

5    Once a silencer is manufactured to completion, is it required

6    to have a serial number at that point?

7    A.    Yes.

8    Q.    And is that for the purpose of tracking it through the

9    paperwork?

10   A.    Correct.

11   Q.    Okay.  Is it a violation to have a silencer without a

12   serial number?

13   A.    Yes.

14   Q.    And did you bring that to Mr. Melton's attention during

15   the inspection?

16   A.    I believe on the -- by the 25th, I had gotten the

17   explanation for what this box was and then I --

18   Q.    You mentioned an R & D.  What's that?

19   A.    Research and design.

20   Q.    Okay.  And how -- what do you -- how did you know it was

21   an R & D box or an R and design?

22   A.    Well, that's how Mr. Melton had described it, that these

23   are designs that he had tried out, designs that maybe part of

24   it didn't work but he kept or -- and he put together parts from

25   other ones that did work, but they were -- you know, to my eye

1   they were complete silencers.

2            THE COURT:  They were or were not complete?

3            THE WITNESS:  They were.

4            THE COURT:  Okay.

5   BY MR. MOLSEN:

6   Q.   Okay.  And you mentioned you had -- there was another

7   silencer that wasn't registered to him?

8   A.   Correct.

9   Q.   Do you recall the manufacturer of that silencer?

10  A.   It was a Yankee Hill Machine silencer.

11  Q.   Okay.  So that's a separate manufacturing company?

12  A.   Correct.

13  Q.   Okay.  And then so for the Yankee Hill silencer to end up

14  in Mr. Melton's possession, would there had to have been, let's

15  say, an ATF Form 3 completed?

16  A.   Correct, yeah.  For it to legally be there, it would

17  either have had to have been Form 3'd to him if it was from

18  another company, or if it was from a private owner, they could

19  have Form 4'd it to Mr. Melton.

20  Q.   Okay.  Were you able to find either one of those forms to

21  match up with that silencer?

22  A.   No.

23  Q.   Okay.  Did you ask him for an explanation of how that

24  silencer ended up in his possession?

25  A.   I did.

1    Q.    And what did he say?

2    A.    Mr. Melton reported that the owner of that silencer had

3    given it to him as a down payment for a silencer he was having

4    Leadfoot manufacture.

5    Q.    Okay.  But no form -- no required Form 4?

6    A.    Yeah.  I mean, it -- anytime you're transferring stuff

7    like that, it requires one of the NFA forms, and that was not

8    completed.

9    Q.    Okay.  I think we touched on this before, but was there --

10   are baffles part of the internal components of some silencers?

11   A.    Yes.

12   Q.    And is it the baffle that kind of help -- or assists in

13   the noise reduction?

14   A.    Correct.

15   Q.    Okay.  Were some of Mr. Melton's silencers made with

16   baffles?

17   A.    Yes.

18   Q.    And you indicated that there -- that he said that they

19   were handmade; is that correct?

20   A.    Correct.

21   Q.    Did you have the occasion when you were on site to see the

22   baffles?

23   A.    Yeah.  The -- the silencer cores, yeah, were -- I mean,

24   they were prevalent all around the premises, yeah.

25   Q.    And did you -- did you -- did he say that they were

1    handmade on site there?

2    A.   He did.

3    Q.   Okay.  And when you inspected them, did you have reason to

4    be suspicious of that?

5    A.   I did.

6    Q.   And why is that?

7    A.   I mean, they were -- from a layman's perspective, I mean,

8    they were a precision -- precision-made item, and looking at

9    the machinery that Mr. Melton had at the licensed premises, he

10   had a lathe, but, you know, something of the nature of what I

11   was looking at with those monolithic baffle cores, you would

12   expect to see a CNC machine, something like that, to

13   manufacture that many with that level of precision.

14            THE COURT:  Did you say "CNC"?

15            THE WITNESS:  Yeah, CNC, Charlie, Nancy, Charlie.

16            THE COURT:  Thank you.

17   BY MR. MOLSEN:

18   Q.   And a CNC machine, is that a machine that's designed to

19   carve out metal?

20   A.   Correct.

21   Q.   Okay.  No such machinery on site?

22   A.   Correct.

23   Q.   Did you at some point confront Mr. Melton with what you

24   were observing versus what you suspected happened?

25   A.   Yes, yeah.  On the 24th and the 25th, I was asking where

1    the -- how the cores were made, and he had explained that he

2    gets bar stock from his supplier, and, you know, he explained

3    the process of how he would use the lathe and the drill press

4    to manufacture each of these.

5        And, you know, I just kept asking about it and, you know,

6    asked, you know, if -- you know, where -- if he had any samples

7    of the bar stock, and I think he presented like a 2- or 3-inch

8    segment that he found on -- nearby on the floor, and then I

9    kept asking about it and asked if, you know, he had -- how he

10   was able to make them identical, asked him if he used any type

11   of jig or -- or support like that, and he said no, he did them

12   all by hand.  And then eventually on the 1st, when I was there

13   on the 1st, Mr. Melton did acknowledge that he did have those

14   manufactured by another company.

15   Q.   And is that itself a violation?

16   A.   Yeah.  That's -- all of the manufacturing needs to be

17   conducted at the licensed premises --

18   Q.   Okay.

19   A.   -- and --

20   Q.   Could he get approval to do it elsewhere?

21   A.   Yes.

22   Q.   Okay.  Is that called a variance?

23   A.   Yeah.  So, I mean, he could have a marking variance, I

24   mean, and he could -- other FFLs could be part of the

25   manufacturing chain.

1    Q.   And if that was done would he get permission through ATF,

2    would that be documented --

3    A.   Yeah, yeah.

4    Q.   And was there an indication that he had received approval

5    to manufacture parts out, like, off site?

6    A.   No.

7    Q.   Okay.  Did Mr. Melton help you in identifying documents

8    with specific items?

9    A.   Yes.

10   Q.   Okay.  And was that help- -- helpful to you in -- as far

11   as figuring out what goes with what?

12   A.   Yeah, yeah.  In his desk he had, you know, his, like,

13   Form -- he had, you know, files for his Form -- historical Form

14   2s and Form 4s for items that he had made and already sold.  He

15   had all those on file and was able to produce those and help us

16   understand how he had them organized.

17   Q.   Okay.  When the inspection is done, is there anything that

18   Mr. Melton has to sign?

19   A.   At the closing conference he signs acknowledging that he

20   received a copy of the Report of Violations.  The signature --

21   the line is, you know, I certify that I've received this, you

22   know.  That's the gist of it.

23   Q.   Are you able to do that on the 1st?

24   A.   No.

25   Q.   Okay.  So you have to do your report, make your findings,

1  your recommendations, and then return?

2  A.   Correct.

3  Q.   Okay.  So when you return, that's not an inspection.

4  You're just kind of meeting with him.  It's, like, hey, here's

5  the final paperwork?

6  A.   Correct.

7  Q.   Okay.

8  A.   Yeah.  I mean, yeah.  It's the bookend.

9  Q.   Okay.  When -- when you leave on the 1st, do you give him

10 an indication of how things stand or how things are looking?

11 A.   Yeah.

12 Q.   And did you -- what did you advise Mr. Melton in this

13 case?

14 A.   I had advised him that if he was wanting to maintain his

15 FFL, he is going to have a lot of work ahead of him, and I

16 explained, you know, some of the thing -- the concerns or the

17 discrepancies that we found.  And I let him know that I would

18 be putting together, you know, the Report of Violations which

19 would document what needs to be done to get these fixed.

20      And I told him, okay, here's things that you can be

21 working on now prior to the closing conference so that, you

22 know, if you're serious about doing the work necessary to

23 correct these violations, here's what you need to be doing.

24 But I did let him know that if the -- if it was just too much

25 and he wanted to wash his hands and walk away, you know, he did

1    have the option of surrendering his license.

2    Q.   Okay.  And that's had at the 1st, when you're done with

3    the inspection?

4    A.   Yeah.  I know we talked about that on the 1st, yeah.

5    Q.   Okay.  At this point, once the inspection is finally done

6    and completed and you have that conversation, what do you do at

7    that point?

8    A.   On the 1st?

9    Q.   Uh-huh.

10   A.   I returned back to Omaha and then spend the next few weeks

11   just compiling everything because, you know, it wasn't just

12   that I had to figure out that he wasn't doing 4473s.  How many?

13   And go through all the -- everything and match it up.

14   Q.   So did basically you just leave at that point?

15   A.   Yes.

16   Q.   Is Mr. Melton arrested or anything at that time?

17   A.   No.

18   Q.   Okay.  Ever told he was going to be arrested?

19   A.   No.

20   Q.   And I think we mentioned Special Agent Shelton and

21   Sorenson leave after a couple hours on the 24th.  Did they come

22   back on the 25th?

23   A.   No.

24   Q.   Did they come back on the 1st?

25   A.   No.

1    Q.    Who was with you on the 25th?

2    A.    IOI Vickers.

3    Q.    Okay.  The other inspection officer?

4    A.    Correct.

5    Q.    Okay.  And then was anybody with you on the 1st?

6    A.    IOI Vickers was with me once again.

7    Q.    And he has the same role that you -- or he's in a trainee

8    status but essentially the same job?

9    A.    Yeah, yeah.

10   Q.    Yeah.  So you -- basically, when you leave, you're telling

11   him, "You can either work towards coming into compliance or

12   just surrender your license"?

13   A.    Correct.

14   Q.    Okay.  Over the months that follow, did you continue to

15   have communications with Mr. Melton?

16   A.    I did.

17   Q.    Did you do so over the phone?

18   A.    Over the phone and email and text.

19   Q.    Okay.  Did you give him a deadline, basically a deadline

20   in which to come into compliance?

21   A.    As of the 1st, I had not yet.  The deadlines weren't put

22   in place until after the closing conference, which in the

23   Report of Violation there are suspense dates where, okay, I

24   need you to have it done by such-and-such date.

25   Q.    On -- when did -- the closing conference, when did that

1   take place?

2   A.    November 7th.

3   Q.    And where did that take place at?

4   A.    At Mr. Melton's shop, at Leadfoot.

5   Q.    So you went back out to Holdrege?

6   A.    Yes.

7   Q.    And did anybody go with you on that day?

8   A.    That one I was on my own.

9   Q.    Okay.  So you head back out to Holdrege.  Did you meet

10  with Mr. Melton at his shop?

11  A.    Yes.

12  Q.    And what happens during that closing conference?

13  A.    During the conference Mr. Melton had shown me steps that

14  he had taken to get his manufacturing process organized, and

15  then we sat down, and we went through the violations discovered

16  during the inspection.  And during this time, you know, I give

17  him the opportunity to ask any questions to make sure he

18  understands what there was.

19       And I think there's even one thing that we corrected that

20  I had on the RO- -- on the Report of Violations that he had

21  reminded me that we had addressed, and so I had struck that

22  from the Report of Violations.  And then, yeah, we -- you know,

23  from there we talked a bit about Husker football, and just, you

24  know, I implored him that, you know, if he was serious about

25  keeping his license to get these corrective actions completed.

1    Q.    And so you were giving him the option then of trying to

2    come in compliance, then, still?

3    A.    Correct.

4    Q.    Okay.  And so on the 7th, are you doing any more

5    inspection, or is it just primarily conversation and answering

6    questions?

7    A.    Primarily conversation, answering questions.  There was

8    some confirmation of stuff that he -- that Mr. Melton said that

9    he had completed that, you know, we just verified or

10   double-checked, but the -- the gist of it was just reviewing

11   the Report of Violations and the corrective actions so that he

12   understood what he needed to do.

13   Q.    Did you identify for him or give him a deadline in which

14   to complete his work to come into compliance?

15   A.    Yes.

16   Q.    And what was that deadline?

17   A.    Just making sure that it's consistent.  For the -- for the

18   ones where he -- he did need to take action, I had given him a

19   deadline of December 8th.

20   Q.    Okay.  And did he come into compliance by that date?

21   A.    No.

22   Q.    Did you ever -- did you receive more communication from

23   him after December 8th?

24   A.    Yes.

25   Q.    And what was the nature of that communication?

1  A.   I'm trying to -- so I would check on -- I had -- in part

2  of the corrective actions, he was to go through and identify of

3  all of the silencers that he reported as manufactured to ATF,

4  confirm which ones were actually manufactured and which ones

5  were never made so that we could start the process of having

6  those removed from the record or I mean -- what else did I have

7  him do?  Get his actual manufacturer's record into compliance.

8      The manner in which he was maintaining his manufacturer's

9  record, which he's required to keep, didn't meet the

10 requirements, and so I was telling him, okay, you need to make

11 sure these are all lined up.

12 Q.   Okay.  Does -- at some point does he ask for more time?

13 A.   No.

14 Q.   Okay.  And is this -- those communications, are those by

15 email or over the phone, or how are those being done?

16 A.   Primarily phone and email.

17 Q.   Okay.  Any text messages back and forth?

18 A.   Yeah.

19 Q.   Okay.  When you meet with him on the 7th for that closing

20 conference, who chose the time and place?

21 A.   I did just to make -- but -- you know, to make sure that

22 it would work for -- for him.

23 Q.   Okay.  And then -- okay.  And the silencers that were in

24 question, like primarily the ones without the serial numbers

25 and then the Yankee Hill silencer that wasn't registered --

1    A.    Uh-huh.

2    Q.    -- where were those on the 7th when you met with him?

3    A.    On the 7th, they were back in his workshop area.

4    Q.    Okay.  Still in his custody?

5    A.    Yes.

6    Q.    Okay.  And then after you had that closing conference,

7    basically I take it you go home and you're done or go back to

8    Omaha, at least, or --

9    A.    That day, yeah, yeah.

10          MR. MOLSEN:  Okay.  Okay.  I have no further

11   questions at this time.

12          THE COURT:  Cross-examination.

13          MR. FERDICO:  Thank you.

14                    CROSS-EXAMINATION

15   BY MR. FERDICO:

16   Q.    IOI Kubert, just to make sure -- and is it Kubert or

17   Kubert?  I'm sorry.

18   A.    The former, Kubert.

19   Q.    Okay.  Thank you.

20   A.    Yeah.

21   Q.    With a name like Ferdico, I can be sensitive to that; so I

22   apologize.

23   A.    Appreciate it.

24   Q.    So you talked a little bit about the differences between

25   industry operations inspection -- inspectors like yourself and

1    a special agent.

2    A.    Uh-huh.

3    Q.    And a special agent is a certified law enforcement

4    official and undercover law; correct?

5    A.    Correct.

6    Q.    Okay.  They have the power to arrest.  They are the ones

7    that carry the guns.  They kick in the doors and do all that

8    stuff.  Is that fair?

9    A.    Correct.

10   Q.    Okay.  Not your role?

11   A.    Correct.

12   Q.    Okay.  Oftentimes in the field when you do these

13   inspections, you're by yourself because the concept of a

14   compliance inspection is you're just going to verify that books

15   are in order, that firearms are accounted for, and make sure

16   that there's nothing horribly amiss.  Is that fair?

17   A.    Correct.

18   Q.    Okay.  Now, you mentioned that you brought two special

19   agents along with you because of concerns about his arrest

20   record.  Now, I want to clarify that, because in order to have

21   an FFL, you have to be -- you can't be a prohibited person; is

22   that correct?

23   A.    That's correct.

24   Q.    And what I mean by that, just to make the record clear, is

25   we're -- and to make sure that we're speaking the same

1   language -- I'm confident we are -- but to make sure we're

2   speaking the same language, a prohibited person, when I use

3   that term, is kind of an industry term that refers to people

4   who are not allowed to own, possess or transfer items under the

5   Gun Control Act?

6   A.   Correct.

7   Q.   Okay.  So generally speaking, if you can buy a firearm,

8   technically you are -- technically you can become an FFL.  I

9   understand there are -- there are some business licensure

10  requirements, and there may be some local -- what's the term --

11  zoning requirement issues, but for the most part, if you can

12  own a firearm, you can be an FFL?

13  A.   Correct.

14  Q.   Okay.  And so there are people who can have arrests and

15  tickets but still -- in their background, but that wouldn't

16  necessarily prohibit them from owning a firearm or being an

17  FFL?

18  A.   Correct.

19  Q.   Okay.  And generally speaking, people who are prohibited

20  persons include felons; is that correct?

21  A.   Correct.

22  Q.   Okay.  It would include misdemeanor people --

23  misdemeanants who have been convicted of a crime of domestic

24  violence?

25  A.   Correct.

1    Q.    Okay.  They would include abusers or persons addicted to

2    prescription or nonprescription medication?

3    A.    Correct.

4    Q.    Okay.  In other words, they're a class of people that

5    could be considered to be dangerous?

6    A.    Correct.

7    Q.    Okay.  But there are also many violations that people can

8    have that don't necessarily make them dangerous or make them

9    prohibitive of owning a firearm; is that fair?

10   A.    Yes, sir.

11   Q.    Okay.  And Mr. Melton at the time was a licensed -- a duly

12   licensed FFL holder?

13   A.    Yes, sir.

14   Q.    Okay.  Now, you had mentioned that, generally speaking,

15   because of the -- it's not a secret in the industry that there

16   are not enough IOIs to conduct yearly regulatory inspections on

17   every FFL holder in the United States.  That's not a problem

18   unique to Nebraska?

19   A.    Correct.

20   Q.    Okay.  And so generally what happens is people -- if I

21   understood your testimony correctly, people at kind of a higher

22   pay grade than yours -- and no disrespect -- kind of prioritize

23   who you're going to go touch based on their agendas; is that

24   fair?

25   A.    Yes, sir.

1    Q.   Okay.  And your job isn't to go in and shut FFL holders

2    down.  Is that fair?

3    A.   Correct.

4    Q.   Okay.  Your job is to -- in some ways you're a resource to

5    FFL holders who may be making technical errors that you can

6    help them get better at doing what they're doing so that the

7    ATF can do its job.  Is that fair?

8    A.   Yes, sir.

9    Q.   And the regulation -- we'll get into some of the

10   regulation soup that is the Gun Control Act and the CFRs

11   related to it, but there are a lot of them.  Is that fair?

12   A.   Yes, sir.

13   Q.   And a highly regulated industry, firearms?

14   A.   There are regulations for the firearms industry.

15   Q.   Would you consider it a highly regulated industry?

16   A.   And I'm not trying to be difficult, but it is the only

17   industry that I've ever regulated --

18   Q.   Sure.

19   A.   -- so -- but yeah.

20   Q.   That's fair.  The -- with regard to your inspections, it

21   would be fair to say that it would be rare that you would walk

22   in to an FFL holder and not find some sort of violation?

23   A.   Correct.

24   Q.   Okay.  It's kind of like the tax code that it can be so

25   complicated that even the best intentioned people are going to

1    make mistakes?

2    A.    Yeah.  FFLs make mistakes, yeah.

3    Q.    Okay.  Yeah.  And you help them through that process, and

4    oftentimes they get better and move on?

5    A.    Yes, sir.

6    Q.    Okay.  To clarify some of the conversations that we've

7    had -- I'm sorry, some of the conversations that have been had,

8    I'm going to use three terms, two of them interchangeably, and

9    I kind of want to help define those for the record.  We've

10   talked about -- I'm going to use the terms Title 1 firearms,

11   Title 2 firearms, and NFA firearms.  Are you familiar with

12   those terms?

13   A.    Yes.

14   Q.    Okay.  A Title 1 firearm is essentially any firearm that I

15   can go into Scheel's and purchase using a 4473.  Is that fair?

16   A.    Yes, sir.

17   Q.    Okay.  And a Title 2 firearm are the specialized firearms

18   that are controlled by the NFA.  Is that accurate?

19   A.    Yes, sir.

20   Q.    Okay.  And we also refer to those as Class III firearms?

21   A.    Right.

22   Q.    Is that -- so a Class III and Title 2 firearms are

23   interchangeable terms?

24   A.    Yeah.  I mean, in terms of the industry, yes.  Class III,

25   to get into the weeds a little bit, specifically refers to

1    dealers.  Class II would be a manufacturer of NFA --

2    Q.    Yeah.

3    A.    -- but among the industry and enthusiasts, Class III is

4    kind of also used as an interchangeable term.

5    Q.    Okay.  But we're talking about -- essentially, from the

6    buyer perspective, it's really a Title 1 firearm or a Title 2

7    firearm, but I still call it a Class III, because that's what

8    everybody calls it.

9    A.    Correct.

10   Q.    Okay.  So now Title 2 is interesting, and what I'm

11   referring to -- and correct me if I'm wrong -- is Title 1 of

12   the Gun Control Act and Title 2 of the Gun Control Act.  Is

13   that accurate?

14   A.    Yeah.  In my active vocabulary I think of things at 478

15   and 479 --

16   Q.    Okay.

17   A.    -- from the CFR --

18   Q.    Okay.

19   A.    -- and so I don't want -- I just --

20   Q.    Okay.

21   A.    Yeah.  478 and 479.

22   Q.    Okay.  And 478 refers to the --

23   A.    The Gun Control Act.

24   Q.    -- regulations --

25   A.    Yeah.

1    Q.    -- with regard to the --

2    A.    Gun Control Act.

3    Q.    -- Gun Control Act, and 479 refers to the NFA?

4    A.    Correct.

5    Q.    Now, the NFA is, interestingly enough, in the IRS Code,

6    isn't it?

7    A.    Correct.

8    Q.    Okay.  Because it's a taxing scheme?

9    A.    Yes, sir.

10    Q.    Okay.  It's -- now, of course, there are regulations with

11    regard to taxing, and it's part of that, so that's what you do.

12    But Form 4 is actually a tax return, isn't it?

13    A.    That's correct.

14    Q.    Okay.  And the stamp you talk about is a tax paid stamp.

15    In other words, when the ATF receives it, has verified that the

16    tax return is filled out correctly, has verified that the

17    person that is being the -- the item who is -- the person who

18    is requesting to take possession of this item is not a

19    prohibited person and that they've received their tax, they

20    mark it as tax paid, and that return then goes to the

21    individual consumer as his record that they have completed the

22    appropriate process?

23    A.    Correct.

24    Q.    Okay.  So there's really no distinction -- ignoring state

25    laws, there's no distinction under federal law as to somebody

1  who can own a Title 1 firearm versus a Title 2 firearm.  The

2  only issue is whether you pay a particular tax or not and

3  follow the procedures in paying that tax; is that fair?

4  A.    Correct, outside of state considerations.

5  Q.    Right.  Outside of state rules?

6  A.    Yes, sir.

7  Q.    Some states don't allow NFA items?

8  A.    Correct.

9  Q.    So in other words, as a practical matter for the consumer,

10  if I can buy a gun in Scheel's, I can buy a Title 2 firearm or

11  a Class III firearm as long as I pay my tax and have the

12  appropriate paperwork filed in advance of me taking possession

13  of it?

14  A.    Correct.

15  Q.    Okay.  So it's complicated, but it's not really as

16  complicated as it seems?

17  A.    There's a learning curve but, yeah, it's masterable.

18  Q.    Okay.  Now, in this particular case Leadfoot wasn't on --

19  Leadfoot was brought to your attention, and you were asked to

20  conduct a compliance inspection of them because they had

21  received a report from a known individual that Leadfoot was

22  engaged in violations of the Gun Control Act or the NFA?

23  A.    Correct.

24  Q.    Okay.  And that report you listed, if I'm accurate, you

25  were -- the report that you were referring to, to help with

1    your testimony here, was that your Firearms Inspection Report,

2    revised, of July 1st, 2015?

3    A.    Okay.  I want to make sure that we're -- the information

4    that ATF received that prompted a compliance inspection?

5    Q.    No.  Thank you.

6    A.    Okay.

7    Q.    You had referred to a report during your testimony today

8    to refresh your recollection.

9    A.    Correct.

10   Q.    Is that correct?

11   A.    Yes, sir.

12   Q.    And was -- the report you were referring to, was that your

13   Firearms --

14   A.    Yes, sir.

15   Q.    -- Inspection Report?

16   A.    Yes, sir.

17   Q.    Revised July 1st, 2015?

18   A.    Yeah.  And for your information that revised date was when

19   the template was revised by our operations folks --

20   Q.    Okay.

21   A.    -- and nothing pertaining to this inspection.

22   Q.    Okay.  The date on the inspection is actually -- or the --

23   what -- where do I find in this the date of the report?

24   A.    So on the -- the report I have a digital signature on page

25   21 --

1   Q.   Okay.

2   A.   -- of February 9th.

3   Q.   Okay.  So this report would have been finalized by you on

4   February 9th --

5   A.   Yes, sir.

6   Q.   -- of 2000 -- what date?  I'm sorry.

7   A.   2018.

8   Q.   '18?  Okay.

9            MR. FERDICO:  Can I approach?

10           THE COURT:  Yes.

11           MR. FERDICO:  I'd like to mark this as Exhibit 1.

12           COURTROOM DEPUTY:  I'll make it 101 for you.

13           MR. FERDICO:  Okay.  Thank you.

14           THE COURT:  Is it going to be 101?

15           MR. FERDICO:  101, Your Honor.  Thank you.

16           THE COURT:  All right.

17  BY MR. FERDICO:

18  Q.   And I'm going to -- probably smudge the ink -- hand you a

19  copy of Exhibit 101 and see if that's a true and accurate --

20  A.   Okay.

21  Q.   -- copy of the report you've been talking about.

22           THE COURT:  Mr. Molsen, are you going to have any

23  objection to this report being received?

24           MR. MOLSEN:  No, Your Honor.

25           THE COURT:  Would you like me to just receive 101 at

1    this time?

2              MR. FERDICO:  Yes, Your Honor.

3              THE COURT:  Exhibit 101 is received.

4              MR. FERDICO:  And then I'd like to mark 102, which is

5    a copy of Exhibit 1 to 101.

6              THE COURT:  Well, that's fun.  Okay.  102, which is

7    Exhibit 1 to 101.  Is that what you said?

8              MR. FERDICO:  Yes, yes.  That's the police report.  I

9    had that printed out, and I apparently left it on my desk, but

10   it was attached to my brief.

11             THE COURT:  All right.  Why don't -- let me -- let me

12   look in the brief, and then I'll ask the government if I can

13   take judicial notice of it.  So just a moment.

14             MR. FERDICO:  Thank you.

15             THE COURT:  Or I can print it.

16             MR. KALEMKIARIAN:  Judge, we have a copy of our

17   brief.

18             MR. FERDICO:  I'm sorry.  I've got --

19             THE COURT:  Do you have one?

20             MR. FERDICO:  Yeah.

21             MR. KALEMKIARIAN:  Yes.

22             THE COURT:  Okay.  Let's do it that way.

23             MR. FERDICO:  Yeah.  My apologies.

24             MR. MOLSEN:  I have no objection, Your Honor.

25             THE COURT:  All right.  102, which is Exhibit 1 of

1    101, is received.

2              MR. FERDICO:  Okay.

3              THE COURT:  Assuming that somebody knows what it is

4    here in just a moment.

5              MR. FERDICO:  Yes.

6    BY MR. FERDICO:

7    Q.   I'm handing you Exhibit 102.  Is this the document that's

8    referenced on 101 as Exhibit No. 1?

9    A.   Yes, sir.

10   Q.   Okay.  And is that a true and accurate copy?

11   A.   Yes, sir.

12             MR. FERDICO:  Okay.  Thank you.  With that I'd

13   confirm that they've been offered and received, Your Honor?

14             THE COURT:  They have been offered and received.

15             MR. FERDICO:  Thank you.

16             MR. MOLSEN:  And Your Honor?

17             THE COURT:  Yeah.

18             MR. MOLSEN:  These do entail tax records; so we'd ask

19   that they just be restricted to the parties, if we can.

20             THE COURT:  Sure.

21             MR. MOLSEN:  Okay.

22             THE COURT:  They'll be -- how do we do that, Jeri,

23   when they're -- okay.  She's nodding yes; so she knows how to

24   do it.  So we're good.

25             MR. MOLSEN:  All right.  Thank you.

1          MR. FERDICO:  And for clarification, just for the

2    record, these are offered for the -- for purposes of the

3    suppression hearing only.

4          THE COURT:  All right.

5          MR. FERDICO:  Thank you.

6    BY MR. FERDICO:

7    Q.   Those reports accurately reflect the nature of the

8    conversations that you had with Mr. Melton?

9    A.   Yes, sir.

10   Q.   Okay.  And those reports accurately reflect the time line

11   of events?

12   A.   Yeah.  The inspection report.

13   Q.   Yes.

14   A.   Not Exhibit 1 to --

15   Q.   Correct.  Thank you.  Exhibit 101.  So if there were

16   slight variations, would it be fair -- in your testimony versus

17   the report, would it be fair to defer to the report as being

18   more accurate?

19   A.   I would think so.

20   Q.   Okay.  Now, you talked about compliance inspections are

21   typically done during business hours by regulation.

22   A.   Yes, sir.

23   Q.   Okay.  And you don't need a warrant for what is defined as

24   a compliance inspection either under federal law or under the

25   Code of Federal Regulations?

1    A.    Correct.

2    Q.    Okay.  Are you familiar with the two types of warrants the

3    ATF can obtain?

4    A.    Yeah.  You know, we have the -- like, I guess, a regular

5    search warrant and then an administrative warrant.

6    Q.    Inspection warrant?

7    A.    Inspection warrant, yeah.

8    Q.    Okay.  So there are two types of warrants that the ATF is

9    required to obtain under certain -- if certain conditions are

10   met.  Is that fair?

11   A.    Yeah.

12   Q.    And I'm being extremely general.

13   A.    Yeah.

14   Q.    Just -- you're familiar with what an inspection warrant

15   is?

16   A.    Correct.

17   Q.    Okay.  And you're familiar that upon probable cause you

18   can just get a general probable cause warrant?

19   A.    Yeah, I'm aware of --

20   Q.    Okay.  As an IOI, even though you're not the person who

21   has the authority to arrest, if you walk into a place and it is

22   clearly a danger to the public, you can -- you've got resources

23   you can call and shut that place down immediately?

24   A.    I've got resources that I can call, and they would make

25   the decision then.

1    Q.   Okay.  And you talked about the timing of the -- how much

2    time you allot versus how much time it actually takes to

3    conduct these inspections, and the reality is, is when you're

4    allotting -- especially for an FFL who either it's been a

5    number of years since you've been there or it's a first

6    inspection, it's kind of a guess, because you really don't know

7    what you're walking into at that point?

8    A.   Correct.

9    Q.   Okay.  So it's not unusual for you to have to call back to

10   the office and say I need more time because there are -- either

11   is more firearms in inventory or there are more Form 5s than I

12   was expecting or this, that, or the other thing.  Is that fair?

13   A.   Sure.

14   Q.   Okay.  So that, unfortunately, is just an inherent danger

15   of the profession?

16   A.   Correct.

17   Q.   Okay.  And the compliance inspections, being done during

18   business hours, even though you don't require business owners

19   to be there, generally speaking, business owners are there?

20   A.   Correct.

21   Q.   Okay.  That's because it's business hours, and they're

22   running a business?

23   A.   Right.

24   Q.   Okay.  So nothing you're doing requires the business owner

25   to shut down operations in order for you to do your job?

1    A.    Correct.

2    Q.    Okay.  In fact, it's kind of designed that, you know, to

3    the extent possible, you try not to be in the way so that they

4    can continue to engage in their occupation.  Is that fair?

5    A.    My -- my approach is to try to conduct the inspection with

6    minimal interruption to the licensee's business.

7    Q.    Okay.  And that's not uncommon?

8    A.    Correct.

9    Q.    Okay.  Just one more question.  Did you -- you indicated

10   that there -- the December 8th deadline to comply.  Did you

11   prepare a report indicating that you had verified that there

12   wasn't compliance?

13   A.    In my final investigation report, I tracked what happened

14   since the closing conference.

15   Q.    Okay.

16   A.    Yes, sir.

17   Q.    So that would be included in Exhibit 101?

18   A.    Yes, sir.

19           MR. FERDICO:  Okay.  No further questions at this

20   time, Your Honor.

21           THE COURT:  Redirect.

22           MR. MOLSEN:  Yes, Your Honor.

23                         REDIRECT EXAMINATION

24   BY MR. MOLSEN:

25   Q.    There was some discussion of the -- what's been referred

1   to as the NFA items, the Class II items or the -- I'm sorry,

2   the Title 2 or the Class III items, and those encompass things

3   such as silencers, short barreled rifles, fully auto weapons;

4   is that correct?

5   A.    Correct.

6   Q.    Okay.  Are there additional more stringent regulations in

7   place for those types of items?

8   A.    Yes.

9   Q.    And -- and one of those is the -- we've talked about

10  completing the Form 3s and the Form 4s, for example; is that

11  correct?

12  A.    Correct.

13  Q.    And the -- the goal of those forms, is that to have each

14  individual serialized item registered with the government to a

15  specific person?

16  A.    Yes.

17  Q.    Okay.  And so is it important, then, to complete or be in

18  compliance with completing those forms so that those forms

19  can -- those items can be tracked?

20  A.    Yes, sir.

21  Q.    Okay.  And when items such as silencers that fall under

22  that category are not serialized, does it make -- does it make

23  completing that goal difficult?

24  A.    Yeah.  I mean, it wouldn't be -- couldn't be registered.

25  Q.    And is that why it's required to be serialized?

1    A.    Yes.

2    Q.    Okay.  There was some talk about if you had the

3    resources available to shut down the business right away that

4    you could make a phone call, and someone else might make that

5    decision?

6    A.    Yeah.

7    Q.    Have you ever done that in 14 years?

8    A.    No.

9    Q.    Okay.  And there was some talk about there is always going

10   to be some danger doing an inspection; is that correct?

11   A.    Yes.

12   Q.    How often do you ask for agents to accompany you?

13   A.    A couple times a year.

14   Q.    Okay.  And what was the reason why you chose to do so in

15   this case?

16   A.    The nature -- or the information that was received prior

17   to the inspection indicated that Mr. Melton could be volatile,

18   and just looking at the arrest record that there were assaults

19   earlier on, and just, I mean, in general, people do not like to

20   see me and I just -- those factors made me think I should have

21   someone with me.

22   Q.    Okay.  But then after a couple hours of conducting

23   inspection, did you determine that it didn't seem it was going

24   to appear to be an issue in this case?

25   A.    Correct.

1   Q.   And then from that point, once Special Agents Shelton and

2   Sorenson leave, did you ever have the agents with you during

3   this inspection on any of the days after?

4   A.   No.

5            MR. MOLSEN:  Okay.  I have no further questions.

6            THE COURT:  You may step down.

7            MR. FERDICO:  Your Honor, may I ask a question for

8   clarification?

9            THE COURT:  One, uh-huh.

10           MR. FERDICO:  Thank you.

11                        RECROSS EXAMINATION

12  BY MR. FERDICO:

13  Q.   So you would agree, then, that part of your decision to

14  bring the special agents was the prior report that -- in this

15  case, exhibit -- the information contained in Exhibit 102?

16  A.   Yeah.  I mean the -- yeah, yeah.

17           MR. FERDICO:  Okay.  Thank you.  No further

18  questions, Your Honor.

19           MR. MOLSEN:  And no follow-up, Your Honor.

20           THE COURT:  I had heard earlier on that there was

21  something -- let me check in my notes, hang on just a moment --

22  that it was the preinspection and prior arrests.  What were the

23  prior arrests that -- what I had heard was that the two special

24  agents, Cory Shelton and Tony Sorenson, were brought along

25  because of what you knew going into this, which included prior

 1   arrests.  Did I misunderstand what you said?

 2              THE WITNESS:  No.  That's what I said.

 3              THE COURT:  Okay.  What were those prior arrests?

 4              THE WITNESS:  There were arrests for assault when

 5   Mr. Melton, I think, was in his late teens, early twenties.

 6              THE COURT:  Okay, all right.  Any questions on my

 7   question?

 8              MR. MOLSEN:  No, Your Honor.

 9                    FURTHER RECROSS EXAMINATION

10   BY MR. FERDICO:

11   Q.   Nothing in that would have prohibited him from being a FFL

12   holder?

13   A.   That's correct.

14              MR. FERDICO:  Okay.

15              THE COURT:  All right.  You may step down.

16              MR. FERDICO:  Thank you, Your Honor.

17              THE COURT:  Uh-huh.

18              MR. MOLSEN:  And, Your Honor, the government would

19   call Special Agent Shelton.

20              THE COURT:  All right.  Special Agent Shelton.  We'll

21   tell the parties that we have a hard stop at 3:30 for a Quiche

22   interpreter --

23              MR. MOLSEN:  Okay.

24              THE COURT:  -- on a guilty plea.  If we're not done

25   at 3:30, then we will take a break for that plea hearing,

1    because that's -- it's hard for us to arrange those, and we'll

2    get that accomplished and then finish up.

3                    MR. MOLSEN:  Okay.

4                    THE COURT:  Okay?

5                    MR. FERDICO:  Thank you.

6                    COURTROOM DEPUTY:  Please state your full name for

7    the record and spell your last name for me.

8                    THE WITNESS:  It's Cory Shelton, S-h-e-l-t-o-n.

9                    THE COURT:  Okay.  Raise your right hand.

10                    CORY SHELTON, PLAINTIFF'S WITNESS, SWORN

11                    THE COURT:  You may proceed.

12                    MR. MOLSEN:  All right.  Thank you.

13                              DIRECT EXAMINATION

14   BY MR. MOLSEN:

15   Q.   Special Agent Shelton, how are you currently employed?

16   A.   I'm currently employed as a special agent with the Bureau

17   of Alcohol, Tobacco, Firearms, & Explosives.

18   Q.   And what are your general duties in that role?

19   A.   Conduct violent crime investigations and general firearms

20   and explosives violations under federal law.

21   Q.   How long have you worked in that capacity?

22   A.   A little over four and a half years.

23   Q.   On -- in August of 2017, did you have the occasion to

24   accompany Industry Operations Inspector Kubert on the

25   inspection of -- on the inspection of Leadfoot, LLC?

1    A.    Yes, I did.

2    Q.    And why was it that you went along on this one?

3    A.    It was requested.  There was a request made through --

4    from -- my boss had assigned it and stated -- I don't remember

5    if it -- what the reason was that I ended up with it, but it

6    was assigned to me that said that they needed at least one or

7    two agents to go with on the inspection.

8    Q.    And then when you went with -- once the inspection was

9    underway, what did you do at that time?

10   A.    Myself, I was with Greg Kubert, IOI Kubert, and there were

11   two agents, there were two investigators.  We decided to split

12   and have one agent per investigator.

13   Q.    Okay.

14   A.    So I was with IOI Kubert.

15   Q.    Were you assisting Kubert in what he was doing?

16   A.    Somewhat, but I was more so present.

17   Q.    Okay.  Did you engage in any questioning of Mr. Melton

18   that you recall?

19   A.    I believe I -- I asked some questions.  Some of it I think

20   was more so clarification, from what I remember.  IOI Kubert

21   would ask a question, and I would add something to it or follow

22   up just -- just more so for clarification.

23   Q.    Okay.  Was there a point where you determined that -- that

24   it was no longer necessary for you to be there?

25   A.    As things were progressing, I don't remember exactly how

1    that transpired, but it got to a point -- I believe it was, you

2    know, an hour and a half, maybe two hours in when IOI Kubert

3    had basically told us that he didn't think he needed us there

4    any longer.

5    Q.    Okay.  And at that point do you and Special Agent Sorenson

6    leave?

7    A.    Yes.

8    Q.    Okay.  When was the next time that you had the occasion to

9    meet with Mr. Melton?

10   A.    I believe it was November 8th.

11   Q.    Okay.  Were there some silencers that were of concern in

12   this case?

13   A.    Yes.

14   Q.    And were those silencers that were not identified with a

15   serial number?

16   A.    Some of them, yes.

17   Q.    And then was there an additional silencer manufactured by

18   another company that had not been registered?

19   A.    Yes, and I believe, if I remember correctly, there were

20   one or two that had duplicated serial numbers.

21   Q.    What do you mean by "duplicated serial numbers"?

22   A.    It was a serial number that was already used and had been

23   transferred or sold.  The same item had the same serial number

24   or different -- I'm sorry.  Different items had the same serial

25   number.

1    Q.    Okay.  And does that make it harder to track items?

2    A.    Correct.

3    Q.    Is that a violation of the regulations, of the laws?

4    A.    I believe so.

5    Q.    Okay.  And you said you had next met with Mr. Melton on

6    November 8th; is that correct?

7    A.    Yes.

8    Q.    Now, did -- Investigator Kubert, to your knowledge, did he

9    go back to meet with Mr. Melton on November 7th?

10   A.    I don't --

11   Q.    You weren't -- were you --

12   A.    I wasn't present.  I don't know.  I know I spoke with --

13   with IOI Kubert on November 7th --

14   Q.    Uh-huh.

15   A.    -- who stated that there were 10 items that were in

16   Mr. Melton's possession that were illegal.

17   Q.    On November 8th, did anybody go with you when you met with

18   Mr. Melton?

19   A.    It was Special Agent Tony Winkler.

20   Q.    Okay.  And where did you meet with Mr. Melton at?

21   A.    At his shop, at Leadfoot business' storefront.

22   Q.    Is your office in Omaha as well?

23   A.    Yes.

24   Q.    Okay.  And what was the purpose of meeting with Mr. Melton

25   on November 8th?

1    A.    To pick up the 10 illegal silencers.

2    Q.    As a special agent, do you have the authority to seize

3    items that could be evidence in criminal cases?

4    A.    Yes.

5    Q.    And were you doing that on that occasion?

6    A.    Yes.

7    Q.    Did you communicate with Mr. Melton at all or advise him

8    of what time you'd be out there?

9    A.    I don't remember how that all transpired.  I believe I did

10   it through IOI Kubert.  I believe IOI Kubert had asked roughly

11   what time we thought we would be out there.  I don't recall any

12   phone conversations with Mr. Melton.  I believe everything was

13   done through IOI Kubert.

14   Q.    Okay.  Based on your understanding was it your

15   understanding that Mr. Melton would be expecting you, or was

16   this more of a surprise when you show up?

17   A.    No.  Mr. Melton was expecting us.

18   Q.    Okay.  Did he -- did Mr. -- when you arrived, how did you

19   acquire those?  Did you -- were you able to acquire those 10

20   silencers?

21   A.    Yes.

22   Q.    And how was it you were able to acquire those?

23   A.    When we arrived, I don't remember if Mr. Melton met us out

24   front or if we -- we had knocked on the door.  Mr. Melton met

25   us at the business, took us kind of into -- past the -- the

1   initial showroom, if you will, the first half of the business.

2   We went through the door.  There was more of a workshop there,

3   and then that's where we -- we found the 10 items that he had

4   set out.

5   Q.   And when you enter the store, did you ask to go in, did he

6   let you in, or how did that happen?

7   A.   I don't remember if -- if we had that conversation.  I

8   remember showing up and saying something along the lines of,

9   you know, we're here for kind of the 10 items that you and IOI

10  Kubert had discussed, and at which point he kind of escorted us

11  back to where the items were.

12  Q.   Okay.  So --

13  A.   There was no confrontation at the door.  There was nothing

14  like that.

15  Q.   Okay.  So the reason why you're -- you went past the usual

16  area that's open to the public; is that correct?

17  A.   Yeah, yes.

18  Q.   Okay.  And how is it that you ended up past that area?

19  A.   We went with Mr. Melton.

20  Q.   Okay.  Did he escort you back there?

21  A.   I don't remember if he led us or if he was behind us, but

22  something along the lines of, well, they're back here kind of

23  in the workshop.

24  Q.   Okay.  Would it be fair to say he invited you back there?

25  A.   Yes.

1    Q.    Okay.  Did he identify for you where those items were?

2    A.    Yes.

3    Q.    And did you take those items?

4    A.    Yes, we did.

5    Q.    Did he point them out, or did he hand them to you, or how

6    did that happen?

7    A.    I don't recall if he had them in a box or if they were

8    just on a workshop.  I had had a description and I believe a

9    picture from IOI Kubert of the items, and at which point we

10   received those 10 items from Mr. Melton.

11   Q.    And in the normal course or according to your standard

12   procedure, when you seize evidence like that, do you take an

13   inventory of what it is that you're seizing?

14   A.    Yes.

15   Q.    And did you do so in this case?

16   A.    Yes, we did.

17   Q.    Once you completed the inventory, did you have Mr. Melton

18   acknowledge it?

19   A.    We did.

20   Q.    And how did you -- how did that happen?

21   A.    We filled out a receipt for -- I don't remember what

22   the -- the exact title on the form was, but it's a receipt or

23   an inventory where we had actually listed the 10 items with a

24   description.  Mr. Melton did not have to sign it, but he signed

25   it and placed -- asked what to do with it.  He placed it into

1    his A & D, acquisition and disposition, book.

2    Q.   Okay.  And then once the inventory is completed and then

3    you have those silencers in question, what happened next?

4    A.   As soon as we had the 10 items, we left the business and

5    proceeded back to Omaha.

6    Q.   Okay.  Was Mr. Melton arrested at this time?

7    A.   No.

8    Q.   Was he told he was going to be arrested at that time?

9    A.   No.

10   Q.   Okay.  At either time do you -- as a special agent, do you

11   generally carry a firearm?

12   A.   Yes.

13   Q.   On the first occasion back on August 24, were you dressed

14   in plain clothes?

15   A.   Yes.

16   Q.   Was your firearm concealed or out in the open?

17   A.   It was concealed.

18   Q.   Did you ever brandish your firearm or display it in any

19   way?

20   A.   No.

21   Q.   The same on the 8th, when you returned back there.  Are

22   you dressed in plain clothes, or are you in some sort of

23   uniform or anything?

24   A.   We're in plain clothes.

25   Q.   And your firearm at that time, is it concealed, or is it

1    brandished at any time?

2    A.    It was concealed.

3            MR. MOLSEN:  Okay.  Okay.  No further questions, Your

4    Honor.

5            THE COURT:  Cross-examination.

6                         CROSS-EXAMINATION

7    BY MR. FERDICO:

8    Q.    When you were present at Leadfoot, LLC, that morning,

9    you -- you helped participate in the inspection and the

10   questioning?

11   A.    On the 24th, that initial day?

12   Q.    Yes.

13   A.    I assisted IOI Kubert but I didn't really -- the time

14   period in which I was there, my understanding is it wasn't

15   really an inspection where I was with -- with IOI Kubert as

16   much as it was trying to just get the understanding of where

17   items were, how is business being -- occurred, stuff like that.

18   I was not involved in the reconciliation between items on the

19   floor versus paperwork versus books, no.

20           MR. FERDICO:  Okay.  No further questions.

21           MR. MOLSEN:  No follow-up, Your Honor.

22           THE COURT:  You may step down.

23           MR. MOLSEN:  And I have no further evidence, Your

24   Honor.

25           THE COURT:  Any evidence by the defendant?  Are you

1    okay?

2            THE WITNESS:  Yes, Your Honor.

3            THE COURT:  All right.

4            THE WITNESS:  I'm all right.

5            THE COURT:  That's a -- it was apparently a big step.

6            THE WITNESS:  It was bigger than I was thinking it

7    was, and it was just enough to get me into the wall to spill

8    the water.

9            THE COURT:  Oh, okay.  I'm glad you didn't get hurt.

10   All right.  Mr. Ferdico, any questions?

11           MR. FERDICO:  No, ma'am.

12           THE COURT:  All right.  Do you want to argue it?  You

13   have 15 -- 16 minutes between the two of you.

14           MR. MOLSEN:  I'll just make a really brief argument.

15           THE COURT:  Okay.  Go ahead.

16           MR. MOLSEN:  As far as the Fourth Amendment issue

17   concerns, this comes down to basically just how you interpret

18   the statute, and so the defense's contention is in --

19   basically, under the statute there's a couple different ways in

20   which an inspection can take place.  Under Section (g)(1)(A),

21   that's the section that says if there is, you know, sufficient

22   reason, the agents or the investigators may -- or the

23   inspectors may get a warrant.

24       Then there is the Subsection (B), which lays out some

25   exceptions to that, and one of the -- one of the exceptions is

the inspectors may also conduct an annual compliance inspection

no more than once a year.  And I think from the testimony it's

pretty clear that this was a compliance inspection.  The

testimony is that there was the initial inspection done when

the license was first issued, and then I think it was, what,

three or four years later when this comes up with no

inspections in the interim period.

So the government's -- government's argument here is that

this is very clearly an inspection, a compliance inspection,

the annual compliance inspection under the statute.  That

statute has been held up by the Supreme Court as being

constitutional.  There is no issue in this case.  The defense's

argument basically is -- comes down to an argument that if the

inspectors have reason to believe the inspection's going to be

fruitful, that there are violations, that they're then required

to only go by Subsection (A) and get the warrant.

The problem with that argument is there's nothing in the

regulations, there's nothing in Subsection (A), and there's

nothing in the case law that says that requirement's there.

It's only the defense that says that requirement's there.

So in this case, say, for example, that they conducted an

inspection in January and everything was, you know, fine and

kosher and no issues were -- came up, and then two or

three months later they start getting reports like, hey, this

guy's doing things in violation of the law.  They could not do

1    an annual inspection in that case, but they could follow the

2    Subsection (A) and get a warrant.  That would be a perfectly

3    good example of when you might use Subsection (A).

4         But I think the law is clear according to even the cases

5    that the government cited in its brief.  They can have reason

6    to believe the inspection's going to be fruitful, and there is

7    nothing legally that prevents them from relying on the annual

8    compliance inspection.  And so the key -- the critical step in

9    their argument is the claim that they cannot rely on Subsection

10   (B) if they think the compliance is going to be an inspection,

11   and there's just simply nothing in the statute or the case law

12   that indicates that that's the case.

13        THE COURT:  All right.  Mr. Ferdico.

14        MR. FERDICO:  Your Honor, we would ask for -- we

15   agree, factually, I don't think there's much dispute.

16   Obviously, we disagree with the government's legal analysis,

17   but it is technical, and we would ask for a minimum of

18   two weeks to respond to their brief, and I'm willing to --

19        THE COURT:  Didn't you brief it to begin with?

20        MR. FERDICO:  We briefed it but we didn't -- and then

21   the government briefed it, but we would like to file a response

22   to the government's brief.

23        THE COURT:  I -- 'cause your first brief was 36

24   pages.  Hang on just a second.

25        MR. FERDICO:  That was with the exhibits, 101, one,

1   oh --

2           THE COURT:  Right.

3           MR. FERDICO:  101 and 102, which were 24 pages total

4   so --

5           THE COURT:  All right.  Any objection to them having

6   a post hearing brief?

7           MR. MOLSEN:  No, Your Honor.

8           THE COURT:  All right.  You may have two weeks to

9   file a post hearing brief, and I'm going to call it a post

10  hearing brief because it's not really a reply in this

11  particular situation.

12      So do you want a post hearing brief after their post

13  hearing brief?

14          MR. MOLSEN:  If I could, Your Honor.

15          THE COURT:  Okay.  Seven days, would that be okay, or

16  do you want --

17          MR. MOLSEN:  Yes, I think so.

18          THE COURT:  Okay.  So we're going to do a post

19  hearing for the defendant of 14, a post hearing for the

20  government of seven days thereafter.  Anything else that we

21  need to take up at this time?

22          MR. MOLSEN:  No, Your Honor.  Thank you.

23          MR. KALEMKIARIAN:  Two things, Judge, for

24  clarification.  That's two weeks from today; so November 22nd

25  for the defense.

1          THE COURT:  You didn't have anything else to do on

2    Thanksgiving, did you?

3          MR. KALEMKIARIAN:  I guess I didn't realize that that

4    is Thanksgiving.  Do we want to go out --

5          THE COURT:  Hang on.  Why don't we go with the Monday

6    after Thanksgiving?  Can we go with the 26th?  Would that work

7    for everyone?

8          MR. FERDICO:  Yes, ma'am.

9          MR. MOLSEN:  Yes, Your Honor.

10          THE COURT:  All right.  We'll go with the 26th, and

11    then, obviously, then, the government's would be due seven days

12    thereafter, which would be the 3rd.  All right.  Anything else

13    now?

14          MR. MOLSEN:  No.

15          MR. KALEMKIARIAN:  Judge --

16          MR. MOLSEN:  Sorry.

17          MR. KALEMKIARIAN:  I'm sorry.

18          MR. MOLSEN:  Nothing from the government.

19          THE COURT:  That was only one of your two things

20    so --

21          MR. KALEMKIARIAN:  There were two things, Judge.

22          THE COURT:  Yes.

23          MR. KALEMKIARIAN:  On the second --

24          THE COURT:  I listen.

25          MR. KALEMKIARIAN:  I was made aware last night -- as

1  Your Honor is aware, we have asked for two detention hearings.

2  We have not asked for one in the last month and a half or so.

3  I was made aware of an issue with Mr. Melton's mother last

4  night.  I received a letter from her and a letter from her

5  doctor in which she is requesting, due to her medical issues --

6  and I do have copies for the Court if you're -- if Your Honor

7  would like to see them.  I did provide them to the government

8  this afternoon before the hearing.

9      I'm stating a request that Mr. Melton be released to her

10  to provide her assistance in her day-to-day living.  In

11  addition there was a doctor's note from her physician stating

12  that it would be in her best interest to have somebody to help

13  take care of her, and she does, in her letter, explain why she

14  would like it to be Joe and not other children because of their

15  other obligations.

16      If we could take -- we have 10 minutes.  I would request

17  that we take up detention today.  If not, I would -- I would

18  assert on the record that this is a material condition --

19  excuse me, a material change in conditions that would

20  necessitate an additional hearing and request that we set this

21  for a hearing.

22          THE COURT:  Okay.  Obviously, we have only

23  10 minutes, but I haven't read the documents, and that -- and I

24  would want to do that.  I don't -- I -- I don't have any

25  objection.  I do think that that's a material change.  Are

1    people available tomorrow to take this up?

2              MR. MOLSEN:  Yes, Your Honor.

3              MR. KALEMKIARIAN:  At what time, Judge?

4              THE COURT:  I have -- hang on just a second here.

5    Could we do it at 10:30?

6              MR. KALEMKIARIAN:  I'm going to most likely be in --

7    I have a hearing in Omaha at 10:30, but I could probably get

8    coverage over here.  Can we set it for 10:30 for now?

9              THE COURT:  You're in Omaha at 10:30; so then you

10   would be -- how long will you be there?

11             MR. KALEMKIARIAN:  I was planning on going to jail to

12   see another one of my clients after that.

13             THE COURT:  Okay.

14             MR. KALEMKIARIAN:  I can make something work, though,

15   Judge.  If we want to set it at 10:30, I can probably get

16   coverage.  If not, I'll -- somehow I can be back after that,

17   then.

18             THE COURT:  Okay.  So when are you back in Lincoln?

19             MR. KALEMKIARIAN:  I can be back at Your Honor's

20   request.  I think the hearing in Omaha will last probably a

21   half an hour; so I could be back most likely by noon if Your

22   Honor requested.

23             THE COURT:  Do we want to do it at -- I have

24   available at one o'clock.  We want to do it at one o'clock?

25             MR. MOLSEN:  Yes, Your Honor.  That works for me.

1        THE COURT:  One o'clock?

2        MR. KALEMKIARIAN:  That will work fine for me.

3        THE COURT:  And then you can do what you need to do

4  in Omaha.  Okay.  One o'clock tomorrow afternoon we'll have

5  a -- but what I need from you, Mr. Kalemkiarian, is I need to

6  see the documents so that I -- and if you can just shoot them

7  to me by an email, that's perfectly fine.  Make sure the

8  government sees them as well.

9        MR. KALEMKIARIAN:  I can do -- I can do a motion for

10  detention hearing.  I'd prefer to email you the documents and

11  not include that as an attachment.  Is that okay?

12        THE COURT:  Perfectly fine.

13        MR. KALEMKIARIAN:  All right.

14        THE COURT:  All right.  We are in recess.

15        MR. KALEMKIARIAN:  Thank you, Your Honor.

16    (3:23 p.m.-- Adjourned.)

17

18              * * * * * * * *

19

20    I, Lisa G. Grimminger, certify that the foregoing is a

21  correct transcription to the best of my ability from the

22  digital recording of the proceedings held in the above-entitled

23  matter.

24

25     */s/Lisa G. Grimminger*     November 30, 2018
       Lisa G. Grimminger, RDR, CRR, CRC  Date

```
1                           I-N-D-E-X
2
3                    Direct   Cross   Redirect   Recross
4
5    WITNESSES:
6    FOR THE PLAINTIFF:
7    Greg Kubert              5       52       68        71,72
8    Cory Shelton           73       81       --          --
9
```

| MOTIONS | Made | Ruled On |
|---|---|---|
| Defendant's sequestration motion | 4 | 4 |
| Defendant's motion to readdress detention | 87 | -- |

| EXHIBITS | Offered | Ruled On |
|---|---|---|
| 101. Firearms Inspection Report | 62 | 63 |
| 102. Exhibit 1 to Exhibit 101 | 63 | 63 |